# IN THE UNITED STATES COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| GEORGE POTZNER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TOMMIE COPPER INC.,<br><br>Defendant. | Civ. Action No. 7:15-cv-03183-AT<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br><u>**JURY TRIAL DEMANDED**</u> |
| WILLIAM LUCERO, RHONDA BOGGS, JEROME JEFFY, and SANDY KONTURA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TOMMIE COPPER INC., TOMMIE COPPER HOLDINGS, INC., THOMAS KALLISH and MONTEL WILLIAMS,<br><br>Defendants. | Civ. Action No. 1:15-cv-06055-AT |

Plaintiffs William Lucero, Rhonda Boggs, George Potzner, Jerome Jeffy, Sandy Kontura, Kathleen Bishop, and Raymond Henderson ("Plaintiffs"), on behalf of themselves and all others similarly situated, hereby allege against Defendants Tommie Copper, Inc., Tommie Copper Holdings, Inc., Thomas Kallish, and Montel Williams (collectively, "Defendants") the following upon their own knowledge, or where they lack personal knowledge, upon information and belief including the investigation of their counsels.

## NATURE OF THE ACTION

1.      This is a class action against Defendants arising out of their sale and marketing of Tommie Copper athletic compression apparel and accessories, each of which incorporate a proprietary "copper-infused" and/or "copper and zinc-infused" fabric (collectively, the "Tommie Copper Products" or "Products").[1]

2.      According to Defendants, "the benefits of copper have been extolled for centuries" and "[c]opper is well known for its anti-inflammatory properties, and inflammation is one of the major causes of pain."[2]  Capitalizing on this falsehood and the implication that Tommie Copper Products are based on scientific principles, Defendants, through an extensive, widespread, comprehensive, and uniform nationwide marketing campaign, commenced marketing Tommie Copper Products as a "revolutionary breakthrough" treatment for pain relief.

3.      Specifically, Defendants claim that: "Copper stimulates the immune system to fight infections, repair injured tissues, and promote healing."[3]  Defendants further claim that "[c]opper also helps to neutralize 'free-radicals' which can cause severe damage to cells."[4]  As a result, Defendants represent that the Tommie Copper Products will purportedly, among other benefits: relieve pain, including arthritis and other chronic joint and muscular pain; aid in injury management; accelerate or speed muscle and joint recovery; and improve muscular power,

---

[1]      The Tommie Copper Products include, but are not limited to, Defendants' Crew Compression Socks, Calf Compression Socks, Back Brace, Men's Long Sleeve Compression Shirts, Women's Long Sleeve Compression Shirts, Women's Compression Tights, Wrist Compression Sleeves, Ankle Compression Sleeves, Calf Compression Sleeve, Elbow Compression Sleeve, Knee Compression Sleeve, Men's Compression Under-Shorts, Women's Compression Shorts, Men's Compression Shirts, Women's Compression Shirts, Half Finger Compression Gloves, and Full Finger Compression Gloves.

[2]      http://www.ispot.tv/ad/7I5j/tommie-copper-compression-sleeve-featuring-montel-williams (last visited July 31, 2015).

[3]      http://web.archive.org/web/20111005153718/http://www.tommiecopper.com/faq (accessed by searching for http://www.tommiecopper.com/faq in the Internet Archive index).

[4]      *Id.*

strength, and endurance.

4.      Defendants even represent that Tommie Copper Products will provide "life changing relief," reducing pain and inflammation associated with debilitating medical conditions such as arthritis, fibromyalgia, lupus, multiple sclerosis, carpal tunnel syndrome, and/or other serious ailments or injuries.

5.      For example, one infomercial campaign prominently features an arthritis sufferer who extolls the purported miraculous healing powers of Tommie Copper:

> I had grade 4 bone on bone arthritis in both my knees. I wound up no longer be able to walk a golf course because I couldn't deal with the swelling that would occur.  I got the Tommie Copper compression sleeve, put it on, immediately noticed it was not the torture it had been....[5]  The Tendonitis in my arm was the result of golf.  I had to quit.  I had to stop.  I got the sleeve, I got the knee band and my life has changed . . . [I hit] 600 golf balls in the last 3 days, [and] that's because I can, because of the Tommie Copper. – Ed Garrett[6]

6.      Another infomercial features World Champion Bronco rider Shawn Minor, who claims Tommie Copper Products purportedly helped him obtain relief, including "full rotation" and "mobility" after sustaining numerous job-related injuries, including:

- nine broken bones (in his foot),
- a broken ankle,
- broken toes,
- broken fingers,
- a broken sternum (which was broken "in half" after a bull stepped on him),
- broken legs,
- a "knee pop out,"
- "cracked vertebrae in [his] neck,"
- a broken collar bone, and
- a dislocated shoulder.

---

[5]      https://archive.org/details/WETA_20131012_223000_Washington_Week_With_Gwen_Ifill#start/900/end/960.

[6]      https://archive.org/details/WETA_20131012_223000_Washington_Week_With_Gwen_Ifill#start/960/end/1020.

7.    According to Mr. Minor: "[m]y recovery time with wearing Tommie Copper is next to none.  Since I've been using Tommie Copper, it's made me feel 10 years younger."[7]

8.    To bolster these claims, Defendants enlisted Montel Williams, a well-known public media personality and celebrity endorser, who claims Tommie Copper Products helped him cope with multiple sclerosis ("MS"), an autoimmune disorder in which insulating covers of nerve cells in the brain and spinal cord are damaged, thereby affecting the brain and spinal cord. "Early MS symptoms include weakness, tingling, numbness, and blurred vision. Other signs are muscle stiffness, thinking problems, and urinary problems."[8]

9.    Defendant and Chief Executive Officer ("CEO") Thomas Kallish even credits the Products for saving his life:

> I had broken half of my body.  I couldn't live in the pain I was in.  If I didn't have that sleeve I couldn't sleep at night.  When I tell people that this product works I'm not telling you because I want you to buy one, I am telling you because it basically saved my life.[9]

10.    Not surprising, Defendants' marketing campaign has been highly effective and lucrative (and to the detriment of the proposed Class, defined herein).  When Defendants first launched the Tommie Copper Products in 2010, annual sales reached $25 million in its first year.  By 2013, Defendants publicly reported that sales were on target to do approximately $60-65 million.

11.    Defendants' representations and claims, however, are false and misleading.  Contrary to Defendants' claims, the Tommie Copper Products do not aid in relieving pain, let alone chronic and debilitating pain, such as that associated with arthritis or MS.  Nor do the

---

[7]    http://www.commercialsihate.com/tommie-copper-fake-cowboy-and-his-chewin-tobaccy_topic16836.html (last visited July 31, 2015).
[8]    http://www.webmd.com/multiple-sclerosis/
[9]    https://www.youtube.com/watch?v=KliqEk4xn7M (last visited July 9, 2015).

Products: neutralize "free-radicals"; stimulate the immune system to fight infections; repair injured tissues; or promote healing. In fact, clinical tests have found no meaningful therapeutic effect for copper concerning pain, inflammation, physical functioning, and stiffness beyond those of a placebo for patients with pain symptoms.

12.     Defendants' hoax involves numerous false and misleading statements, as well as omissions of material fact, concerning the Products that have injured Plaintiffs and the Class by inducing them to purchase worthless and/or overpriced products. Defendants do so with one goal in mind - to reap enormous profits at the expense of unsuspecting consumers in search of pain relief. Defendants, however, should be held accountable and liable for their deceptive conduct in the marketing and sale of Tommie Copper Products.

13.     Defendants knew or should have been aware of the misleading nature in the representations regarding the efficacy of copper-infused compression fabric on pain relief, accelerations in recovery, and improvements in muscular power, strength, endurance, and injury management.

14.     Had Plaintiffs and Class Members known about the misleading nature in the representations regarding the efficacy of copper-infused compression fabrics described herein, and that the Tommie Copper Products do not provide pain relief, accelerate recovery, or improve muscular power, strength, endurance, and injury management, they would not have purchased, or would not have paid as much for, the Tommie Copper Products.

15.     Plaintiffs assert claims on their own behalf, on behalf of a Nationwide Class, and on behalf of subclasses under California, New York, Georgia, Ohio, Iowa, and Florida for: negligent misrepresentation; unjust enrichment; violation of the federal Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.; New York's Breach of Express Warranty, N.Y. U.C.C. § 2-313; New York's Breach of Implied Warranty of Merchantability, N.Y. U.C.C. § 2-314; New

York's Unfair and Deceptive Practices Law, N.Y. Gen. Bus. Law § 349; New York's False Advertising Law, N.Y. Gen. Bus. Law § 350; California's Breach of Express Warranty, Cal. Com. Code § 2313; California's Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314; California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750, *et seq*.; California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*.; California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*.; Georgia's Breach of Express Warranty, Ga. Code Ann. § 11-2-313; Georgia's Breach of Implied Warranty of Merchantability, Ga. Code Ann. § 11-2-314; Georgia's Fair Business Practices Act, Ga. Code Ann. § 10-1-393; Iowa's Private Right of Action for Consumer Frauds Act, Ia. Code Ch. 714H; Iowa's Breach of Express Warranty, Ia. Code § 554.2313; Ohio's Breach of Express Warranty, O.R.C. § 1302-26; Ohio's Breach of Implied Warranty of Merchantability, O.R.C. § 1302-27; Ohio's Consumer Sales Practices Act, O.R.C. §§ 1345, *et. seq*.; Florida's Breach of Express Warranty, Fla. Stat. § 672.313; Florida's Implied Warranty of Merchantability, Fla. Stat. § 672.314; and Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

17.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), as amended by the Class Action Fairness Act of 2005 ("CAFA") because (a) the matter in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000.00, and (b) is a class action in which Plaintiffs and two-thirds of the proposed Class Members are from a different state than Defendants.

18.     Personal jurisdiction is derived from the fact that Defendants systematically and

continuously conduct business within the state of New York, Tommie Copper maintains a principal place of business within the state of New York, and many of the false and misleading statements at issue in this case emanated from the state of New York.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendants' principal place of business is located within this judicial district.

### PARTIES

20.    Plaintiff William Lucero is a citizen and resident of the state of California.

21.    Plaintiff Rhonda Boggs is a citizen and resident of the state of Georgia.

22.    Plaintiff George Potzner is a citizen and resident of the state of Iowa.

23.    Plaintiff Jerome Jeffy is a citizen and resident of the state of New York.

24.    Plaintiff Sandy Kontura is a citizen and resident of the state of Ohio

25.    Plaintiff Kathleen Bishop is a citizen and resident of the state of Florida.

26.    Plaintiff Raymond Henderson is a citizen and resident of the state of Florida.

27.    Defendant Tommie Copper, Inc. is a Delaware corporation and maintains a principal place of business in Westchester County, New York. Founded in 2010 by Defendant Thomas Kallish, Tommie Copper Inc. manufactures and sells a line of copper-infused compression products (the "Products") purportedly designed as a "natural solution" to address pain relief, repair tissue or accelerate recovery, neutralize "free-radicals", and improve muscular power, strength, endurance, and injury management.[10]    Tommie Copper describes itself as

---

[10]    *Tales of Business Expansion in Westchester*, Westchester Economic Development Guide, Annual 2014, http://web.archive.org/web/20150506181043/http://www.westchester magazine.com/Westchester-Economic-Development-Guide/Annual-2014/Tales-of-Business-Expansion-in-Westchester/ (accessed by searching for http://www.westchestermagazine.com/Westchester-Economic-Development-Guide/Annual-2014/Tales-of-Business-Expansion-in-Westchester/ in the Internet Archive index).

"representing the next evolution of performance and recovery apparel."[11]  Since its inception,

Tommie Copper Inc. has developed a significant e-commerce consumer base.[12]  Tommie Copper

markets its Products through various advertising methods, including direct response television

commercials and infomercials, television shows, and online advertising that include an active

social media presence.

28.     Defendant Tommie Copper Holdings, Inc. is the parent company of Defendant

Tommie Copper, Inc.

29.     Collectively, Defendants Tommie Copper, Inc. and Tommie Copper Holdings,

Inc. are referred to herein as "Tommie Copper."

30.     Defendant Thomas Kallish ("Kallish") is the founder and chairman of Tommie

Copper.  A Westchester native, Kallish "took to wearing compression sleeves for relief"[13] after

his diagnosis with arthritis that stems from "many years of wear and tear on his joints and muscles

from competitive water skiing,"[14] and "a traumatic water skiing accident requiring multiple

surgeries[.]"[15]  Dissatisfied with the available compression wear available in the market, Kallish

"set about creating a thinner, gentler compression garment for 24 hour wear and combined it with

the anti-inflammatory properties of copper[.]"[16]  Kallish personally made and appeared in many

---

[11]     http://www.prweb.com/releases/2014/11/prweb12290190.htm  (last  viewed  July  31,
2015).
[12]     http://globenewswire.com/news-release/2014/07/14/650595/10089235/en/Tommie-
Copper-Announces-Strategic-Investment-From-Tengram-Capital-Partners.html (last visited July
31, 2015).
[13]     http://web.archive.org/web/20110820043922/http://www.tommiecopper.com/faq
(accessed by searching for http://www.tommiecopper.com/faq in the Internet Archive index).
[14]     *Id.*
[15]     http://web.archive.org/web/20130709211756/http://www.tommiecopper.com/faq
(accessed by searching for http://www.tommiecopper.com/faq in the Internet Archive index).
[16]     http://web.archive.org/web/20120530040324/http://www.tommiecopper.com/resources
/blog/ny-moves-magazine-features-tommie-copper  (accessed  by  searching  for  www.tommie
copper.com/resources/blog/ny-moves-magazine-features-tommie-copper in the Internet Archive
index).

of the false and misleading representations set forth herein, including web, print, and television advertisements, and marketing materials directed at consumers nationwide, including Plaintiffs and Class Members, and specifically in this District.

31.    Defendant Montel Williams ("Montel") is a well-known Emmy Award® winning television personality, radio talk show host, inspirational speaker, spokesman, and actor.  Montel was diagnosed with multiple sclerosis in 1999.[17]  According to Defendant Kallish, Montel contacted Tommie Copper after receiving a Tommie Copper product from a friend and was "ecstatic about the relief he found from his painful [m]ultiple [s]clerosis."[18]  However, confusingly, Defendant Kallish also claims that "[j]ust as we were arriving at a final prototype, I gave the shorts to Montel Williams to test, to see if they would help relieve pain he would experience during and after his workouts."[19]  Montel thereafter became a "paid spokesperson"[20] for Tommie Copper, touting the benefits of Tommie Copper Products on his own talk show (The Montel Williams Show), a Tommie Copper Television show hosted by Montel, an episode of The Dr. Oz Show, numerous infomercials, in various interviews, at promotional events, and in various social media posts.  Montel personally made and appeared in many of the false and misleading representations set forth herein, including web, print, and television advertisements or infomercials and marketing materials directed at consumers nationwide, including Plaintiffs and Class Members, and specifically in this District.  Defendant Montel also filmed advertisements

---

[17]    http://edition.cnn.com/SHOWBIZ/TV/9908/23/montel.williams/ (last visited July 31, 2015).

[18]    http://web.archive.org/web/20120530040324/http://www.tommiecopper.com/resources /blog/ny-moves-magazine-features-tommie-copper (accessed by searching for http://www. tommiecopper.com/resources/blog/ny-moves-magazine-features-tommie-copper in the Internet Archive index).

[19]    http://www.prweb.com/releases/2012/4/prweb9398614.htm

[20]     http://www.doctoroz.com/episode/has-montel-williams-discovered-fountain-youth (last visited July 31, 2015).

and/or the Tommie Copper Television Show and appeared at various Tommie Copper promotion events in New York to promote the Products, including the Arthritis Foundation's Jingle Bell Run/Walk.

32.    Collectively, Defendants Tommie Copper, Kallish, and Montel are referred to herein as "Defendants."

33.    At all relevant times, each of the Defendants were engaged in the design, manufacture, production, testing, study, inspection, labeling, marketing, advertising, sale, promotion, and/or distribution of the Tommie Copper Products.

34.    At all relevant times, each Defendant acted in concert with, with the knowledge and approval of, and/or as the agent of, the other defendants within the course and scope of the agency, regarding the acts and omissions alleged herein.

## FACTS COMMON TO ALL CAUSES OF ACTION

## Consumers' Desire for Benign Pain and Inflammation Treatment

35.    Pain of any type is a major symptom in many medical conditions and the most frequent reason for physical consultation in the United States.  Many forms of joint pain involve inflammation – sometimes it is local and other times it can be systemic.  With joints, pain can come from overuse, or injury.

36.    Arthritis is a leading cause of pain and disability worldwide.   Indeed, arthritis is the leading cause of disability among Americans.  It is estimated 52.5 million U.S. adults (about 1 in 5) report having doctor-diagnosed arthritis.[21]   As the U.S. population ages, the number of adults with arthritis is expected to increase sharply to 67 million by 2030.[22]

37.    Arthritis includes more than 100 different rheumatic diseases and conditions.

---

[21] http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6244a1.htm
[22] *Id.*

There are different types of arthritis and related conditions: degenerative arthritis, inflammatory arthritis, infectious arthritis, and metabolic arthritis.  Common symptoms include swelling, pain, stiffness, and decreased range of motion.  These symptoms may come and go, and range from mild, moderate, to severe.  The most common form of arthritis is osteoarthritis - the wearing down of cartilage and bones.  This type of arthritis can be traced to a breakdown in joint cartilage, and it is linked with inflammation.  Hips, knees, spine, hands, and feet are most commonly affected.

38.     Other forms of arthritis that occur often are rheumatoid arthritis, lupus, fibromyalgia, and gout.  Symptoms include pain, aching, stiffness, and swelling in or around the joints.  Some forms of arthritis, such as rheumatoid arthritis and lupus, can affect multiple organs and cause widespread symptoms.  Rheumatoid arthritis is a known autoimmune disease which causes inflammation in the soft tissue or membrane in the joint or synovium.

39.     Not surprisingly, pain can significantly interfere with a person's quality of life and general functioning.  Arthritis is the nation's most common cause of disability.  It limits the activities of 22.7 million Americans—for example, preventing them from being able to climb stairs or walk more than short distances.

40.     Research has shown that individuals with arthritis are less likely to be physically active.  Some people believe that being active will cause pain, make their symptoms worse, or damage their joints.  Others do not know how to exercise safely.  Nearly 44 percent of adults with arthritis report no leisure-time physical activity (compared with about 36 percent of those without arthritis).  Not being physically active is a risk factor for other chronic diseases (*e.g.*, heart disease, diabetes, obesity) and makes it harder to manage these conditions.

41.     Despite the magnitude of the problem, primary treatment options for arthritis have

not changed much in recent years.[23]  Rather, the pain market is currently dominated by opioid analgesics.  According to research from Frost & Sullivan, opioid analgesics earned revenues of $50.2 billion in 2013, and are estimated to reach $60 billion in 2018.[24]  Opioid analgesics, however, have well-known side effects such as addiction and constipation.[25]  As such, there exists tremendous demand for benign pain therapy treatments that excludes these undesirable side effects.

42.    Moreover, as arthritis is more common among adults aged 65 years or older, this growth trend is expected to see a dramatic rise with an aging population as the baby boomer generation, which accounts for about 30% of the U.S. population, grows older.

43.    Capitalizing on this demand and the desperation for non-addictive and effective pain management options, Defendants embarked on a scheme designed to convince consumers about the purported miraculous healing and pain relieving powers of Tommie Copper Products.

**Defendants Capitalize on Increasing Demand for Benign Pain Relief**

44.    Tommie Copper was founded by Defendant Kallish, a middle-aged, self-professed weekend warrior who suffered a traumatic water skiing accident requiring multiple surgeries on his back, knees, and hips, leaving him with chronic and debilitating arthritic pain.  Seeking to mitigate the pain from his condition, Kallish purportedly took to wearing compression sleeves for relief.  According to Defendants, Kallish had also been studying the healing effects of copper related to the body, which has been used in medicine for thousands of years.[26]

---

[23]    http://www.tocris.com/researchArea.php?ItemId=116069#.VU0m8vlVhHw (last visited July 31, 2015).

[24]    http://www.prnewswire.com/news-releases/drug-abuse-triggers-regulations-to-push-the-development-of-tamper-resistant-opioid-formulations-for-pain-management-300092848.html (last visited July 31, 2015).

[25]    http://www.ncbi.nlm.nih.gov/pubmed/18443635

[26]    https://www.youtube.com/watch?v=KliqEk4xn7M (last visited July 31, 2015).

45.     Utilizing his years of experience in the textile industry, Kallish sought to invent a better solution for pain management and/or tissue repair.  Finding only uncomfortable and bulky medical compression garments available, he created Tommie Copper Products, which utilize "revolutionary, proprietary fabric," incorporating copper yarn with compression technology.

46.     According to Defendant Kallish, the results were nothing short of miraculous:

> I had broken half of my body . . . I couldn't live in the pain I was in . . . If I didn't have that sleeve, I couldn't sleep at night . . . When I tell people this product works, I'm not telling you because I want you to buy one, I'm telling you this works because uh, you know this basically saved my life.[27]

47.     With his new found lease on life, Defendant Kallish sought to introduce this "revolutionary breakthrough" solution and/or treatment for pain relief to the masses.  As stated by Kallish, "I went and developed this product made out of copper yarn to mitigate my own pain. It works so well that I decided to start a company called Tommie Copper."[28]

48.     The foundation for Tommie Copper Products is a proprietary copper-infused thread.  According to Defendants "Copper has been used in medicine for thousands of years, one of the world's oldest medical texts, the EBERS PAPYRUS states, 'Treat inflammation with pulverized copper'."[29]  Moreover, Defendants claim that the "symptoms of copper deficiency include osteoporosis, osteoarthritis, and rheumatoid arthritis."[30]

49.     Defendants further claim that the body uses copper to "stimulate[] the immune system to fight infections, to repair injured tissues, and to promote healing" and that "[c]opper has been shown to neutralize 'free-radicals' which can cause severe damage to cells."[31]

---

[27]     https://www.youtube.com/watch?v=KliqEk4xn7M (last visited July 31, 2015).
[28]     https://www.youtube.com/watch?v=eT37qftYI9E
[29]     http://web.archive.org/web/20111005153718/http://www.tommiecopper.com/faq (accessed by searching for http://www.tommiecopper.com/faq in the Internet Archive index).
[30]     *Id.*
[31]     *Id.*

50.    Indeed, Defendant Kallish attributes his recovery and pain relief directly to copper within the Products, stating "I guess the irony is, with all of the modern advances in science, it took something that has been used for thousands of years in medicine—albeit approached in a new way—to find relief."[32]  Kallish even represents that copper in the Products directly targets specific areas of pain, yet also admits that any pain relief benefits of the Products may be attributable to the placebo effect:

> And through the aggregate knowledge of my past, I was able to put copper into a yarn, make some products, and put them on the parts of my body that had pain. Cause my whole motivation was to get off pain pills. I used them; I put them on; they really worked. And convinced they were a placebo, I didn't care. Because they worked.[33]

51.    Kallish even represents that the Products have reduced his hospital recovery time from a minimum of four days to a mere thirty hours:

> I found myself wearing the products all through the four surgeries I had to have; all through the recoveries; all through the rehabs.  And, when you have a hip replacement, you're not supposed to get out of the hospital for a minimum of four days and I was out in thirty hours.  And um, that was because I was able to do the things they needed me to do, and I attribute it to these products I was wearing.[34]

52.    As a result, Defendants represent both expressly and by implication that Tommie Copper Products will purportedly, among other benefits, relieve arthritis and other chronic joint and muscular pain, aid in injury management, accelerate or speed recovery, neutralize "free-radicals", and improve in muscular power, strength, and endurance.

53.    Tommie Copper's marketing has been highly effective.  In 2010, its first year of operation, Defendants sold more than a million Tommie Copper Products, generating annual sales of $25 million.  By 2013, Defendants publicly reported that sales were on target to reach

---

[32]    http://web.archive.org/web/20120530040324/http://www.tommiecopper.com/resources/blog/ny-moves-magazine-features-tommie-copper
[33]    https://www.youtube.com/watch?v=8GdxhpI-Dyc
[34]    https://www.youtube.com/watch?v=gqNwNEc-Gfg

approximately $60 to $65 million.  These benefits were directly conferred on Defendants, as they engaged in the direct sale of Tommie Copper Products to members of the proposed Class.

54.    Tommie Copper Products range in retail price from approximately $19.50 to $99.50.

55.    Tommie Copper Products are, or were, available and sold online at www.tommiecopper.com and/or www.tommiecopper.tv.  Tommie Copper Products are also sold through national retailers, including Vitamin Shoppe, Cabela's, Bed Bath & Beyond, and Amazon.com.

**False and Misleading Marketing of Tommie Copper Products**

56.    Defendants engaged in a massive, uniform marketing and advertising campaign designed to convince consumers that Tommie Copper Products have the ability to, among other things, significantly address pain relief, repair injured tissues, promote healing or accelerate recovery, and improve muscular power, strength, endurance, and injury management.

57.    Defendants disseminated materially false and misleading statements regarding the efficacy of "copper-infused" and/or "copper- and zinc-infused" Tommie Copper Products through a wide range of advertisement mediums, including branded websites, brand sponsorship, earned advertising, cable and broadcast television, editorial content in magazines, and social media.

58.    Defendants also utilize, among other methods, direct response television marketing ("DRTV").  DRTV marketing is a type of aggressive marketing campaign designed to generate an immediate response from consumers in the form of sales or product orders.  The delivery of the response is direct between the viewer and the advertiser, as the customer responds to the marketer directly.  In direct response marketing, marketers, including Defendants, use broadcast media (i.e., cable and broadcast television) to get customers to contact them directly.

59.    Typically, direct response television programs incorporate an infomercial in either

short form (thirty seconds to five minutes) or long form (approximately thirty minutes) direct response programs. The formats discuss and demonstrate products and provide a toll-free number or website for viewers to purchase the products directly. DRTV marketing creates rapid customer awareness and brand loyalty.

60. Moreover, because of this broad reach, DRTV can deliver a large volume of sales and customers.[35] This broad reach also allows the ability to leverage and improve all other medium's results. Through a technique or strategy known as retail driving, Defendants are able to effectively drive retail sales through its nationwide infomercial and advertising programs.

61. Defendants' infomercials aired on various nationwide networks including, but not limited to, TV Guide, Speed Channel, Nat Geo Wild, A&E, and the Discovery Channel. In fact, between November 1, 2012 and October 31, 2013, Tommie Copper was ranked in the top five (5) for long form infomercials in total media dollars spent on programs aired on national cable networks.

62. For example, in one short form infomercial, which aired nationwide, Defendants depict scenes of individuals with restricted mobility or afflicted with debilitating conditions such as arthritis with a voice over that states: "Don't let joint pains and aches caused by arthritis, aging, and injury limit your mobility and rob you of your active life. Stop letting pain get in the way of a good night sleep. Get moving again for less than $25.00."[36] The infomercial also touts that Tommie Copper Products have allowed "[m]illions of people [to] overcome obstacles and achieve[] their dreams . . . " and that "[t]he comfortable compression apparel that Tommie Copper

---

[35]    In fact, this method of advertising is so successful that DRTV has ballooned into a $350 billion dollar industry.
[36]    https://www.youtube.com/watch?v=KliqEk4xn7M (last visited July 31, 2015) (emphasis added).

designs has helped over one million people get back to doing what they love."[37]  True and correct screenshots from the video advertisement featuring these misrepresentations are provided below:





---

[37]    *Id.*



63.    The infomercial also features Defendant Montel, who discusses his diagnosis with multiple sclerosis and his quest to relieve pain, stating, "Tommie Copper compression wear works for me.  I wear a Tommie Copper compression shirt when I work out and I no longer experience the usual aches and pains and the stiffness and I can work out longer and harder than I have been able to do for years."

64.    In another infomercial, a spokesman recounts the success story of a golfer, John McPhee, who was purportedly limited by pain so severe that he was restricted to "going up and down the stairs one at a time."[38]  Within a week of use, Mr. McPhee was purportedly reinvigorated by the astonishing powers of the Tommie Copper Product - "I felt like a new person." Specifically:

**[MCPHEE]** I've been playing golf for a little over 42 years.

---

[38]    https://www.youtube.com/watch?v=wt0rbKpzECk (last visited July 31, 2015).

[ANNOUNCER]  In 2002, at just 50 years old, after achieving his life-long dream of playing in the U.S. Senior Open . . .

[MCPHEE]  I played all four rounds, made the cut and got a chance to play a practice round with Tom Kite.

[ANNOUNCER]  The pain, especially in his knees, began robbing him of a proper swing.

[MCPHEE]  I began a downward spiral where that pain seemed to really restrict my mobility.  When I hit a golf shot, there just . . . there was nothing there.  I tried to fight through it by playing, but the results were the same.  A lot of bad swings, a lot of bad shots, a lot of bad rounds.  I felt like this was a way of life.  Going up and down the stairs one at a time; getting in and out of a car with the aches and pains was something I was going to live with.  It was a very tough time for me.  I did not want to play golf because I was embarrassed.

[ANNOUNCER]  Then, a Tommie Copper sleeve changed everything.

[MCPHEE]  Sometimes you say to yourself, well maybe this has to help.  So I purchased a product and believe me, within a week, I felt like a new person.  I found that my golf game improved a lot because I was able to have the lower part of my mobility, which I didn't have for years, and I was able to play golf and strike the ball the way I knew I could.  I do have more flexibility in my right leg.  It got me to work the club more in the direction towards my target rather than around my target.

65.    Additionally, the infomercial[39] features footage of Mr. McPhee and others actively playing golf with the caption "Reduce Pain . . . Improve Recovery," reinforcing Defendants' misleading adverting claims.  The video also features various screen shots of inflamed and "painful" joints further implying the healing abilities of the Tommie Copper Products.  True and correct screenshots from the video advertisement featuring these images and/or misrepresentations are provided below:

---

[39]        *Id.*





66.     Another infomercial, which aired nationwide on various occasions including Spike

Network on December 28, 2013, features World Champion Bronco rider Shawn Minor, who

claims Tommie Copper Products helped him obtain significant relief from numerous and serious job-related injuries, including a broken sternum, broken collar bone, and cracked neck vertebrae.[40] An excerpt of a transcript of the infomercial is provided below:

> **[MINOR]**  Eight (8) seconds.  It is only 8 seconds but sometimes feels like an eternity.  I don't know another sport as rough on you as riding bareback horse.  It's . . . the most physical demanding sport in rodeo and one of the most dangerous sports there is.  I broke nine bones in my foot, broke my ankle, toes . . . uh, had a bull step on me and break my sternum in half.  Broke both legs, had a knee pop out, cracked vertebrae in my neck, broke my collar bone, dislocated a shoulder, numerous fingers.  You know, the list just goes on and on.  And that stuff, when you get older, takes a lot longer to heal up.

> A friend of mine told me about Tommie Copper.  He said you need to try it.  So I got a shirt and some shorts and within 15 minutes, I could feel in my hips the shorts working.  I started wearing the shirts and I have full rotation, full mobility in both my shoulders now that I haven't had in eight or ten years.

> **[ANNOUNCER]** Tommie Copper is the next evolution in performance apparel.  Copper-infused compression and exercise apparel that helps to relieve pain while increasing muscle and joint performance and recovery.  Go to TommieCopper.com and enter "No Pain" for 10% off compression shorts, shirts, sleeves, and the full line of compression apparel starting at $24.50.

> **[MINOR]** My recovery time with wearing Tommie Copper is next to none.  Since I've been using Tommie Copper, it's made me feel 10 years younger.

67.    Another infomercial reinforces the debilitating effect of pain and how Tommie Copper is a non-prescription based solution that can help "get your life back."[41]  An excerpt of a transcript of the infomercial is provided below:

> **[ANNOUNCER]** What if pain prevented you from doing your job?

> **[COWBOY]** There's a few things in me that are slowing down with age.  Your body just doesn't have it anymore.

---

[40]    http://www.commercialsihate.com/tommie-copper-fake-cowboy-and-his-chewin-tobaccy_topic16836.html (last visited July 31, 2015).
[41]    https://www.youtube.com/watch?v=gqNwNEc-Gfg (last visited July 31, 2015).

**[RON]**  It's pain; real pain.  I was in so much pain; I could not maintain my business.

**[ANNOUNCER]**  Or pursuing what you love.

**[GOLFER]**  That pain seemed to really restrict my mobility.  When I hit a golf shot, there was just . . . there was nothing there.  I did not want to play golf because I was embarrassed.

**[ANNOUNCER]**  Or even got in the way of raising your kids.

**[APRIL THOMAS]**  I wanted to just . . . give it up.

**[ANNOUNCER]** 100 million Americans live with pain.

**[RON]** I couldn't walk up the stairs.

**[ANNOUNCER]**  All of us spend an average of $2,000 every year for temporary relief.  There is a solution

**[COWBOY]**  Since I've been using Tommie Copper, it's made me feel 10 years younger.

**[GOLFER]**  Wearing the Tommie Copper sleeve has not just helped me with my golf game; it's helped me with my life.

68.    Moreover, the same infomercial reinforces the misleading notion that Tommie Copper Products can help consumers deal with serious medical conditions such as osteoarthritis and MS.  For example, the infomercial discusses the plight of Karen Whiddon who was miraculously healed by a Tommie Copper Product:

**[WHIDDON]** For 15 years, I've been dealing with pain and I have been diagnosed with osteoarthritis.  It felt like somebody had stood over the top of my hip with a shotgun and blasted down through my hip and it felt like my heel had been blown off.  I thought that there was no way out.  I didn't want to die.  I felt worthless, you know.  I wasn't doing my job as a mom.

\*\*\*

**[WHIDDON]**  Immediately when I got the Copper gear in the mail, I put it on.  And I would say within a couple of hours, I started to feel like my pain was

retreating.  I slept in it that night and by the next morning, I was completely pain free.  I don't know how to describe it, it just . . . it was gone.

69.     In two paid advertisements that aired as recently as May 7, 2015 on Discovery Life, one spokesperson claims "Tommie Copper compression helps enhance muscle and joint mobility."  The spokesperson further stresses the ease and comfort of Tommie Copper Products and added that Tommie Copper Products "sooth[] [his] aches and pains."[42]

70.     Another 60-second spot states, "Life hurts.  Find relief with Tommie Copper."[43]



71.     Defendants' false and misleading marketing campaign also includes representations made in editorial content for print magazine and digital media.  For example, on April 12, 2012, Defendants issued a press release announcing the release of its copper-infused compression shorts.  According to the announcement published on April 12, 2012:[44]

> Tommie Copper has developed new and innovative compression shorts for men and women designed to help support pain relief and aid muscle recovery.  The shorts utilize Tommie Copper Compression, a process that combines proprietary yarn with an exclusive multi-directional compressive weave.  Since compression only works when you wear it, the shorts are designed to be worn all day, even when you sleep, while they help aid oxygen delivery to the muscles and relieve muscle pain from stiffness and soreness.
>
> Tom Kallish, founder of Tommie Copper, explains that the final design of the shorts couldn't have come sooner.  "Tommie Copper's comfortable compression

---

[42]     http://www.ispot.tv/ad/7zBG/tommie-copper-compression-rodeo-and-ranch (last visited July 31, 2015).

[43]     http://www.ispot.tv/ad/7x4X/tommie-copper-joint-effort (last visited July 31, 2015).

[44]     *Tommie Copper Releases Innovative Compression Shorts for Supportive Relief*, http://www.prweb.com/releases/2012/4/prweb9398614.htm (last visited July 31, 2015).

line has had a tremendous response from those living with daily pain, however customers were asking for something that could provide supportive relief to help with muscle recovery in their hips. Having had lower and hip surgeries myself, I was the perfect test subject to begin developing them . . . ."

72.    Tommie Copper's websites are also replete with misleading advertisements touting the benefits of copper and the ability of Tommie Copper Products to provide dramatic pain relief from debilitating ailments.  For example, on www.tommiecopper.tv,[45] Defendants prominently feature Defendant Montel along with the slogan: "Start Living Pain Free."[46]

---

[45]    By mid-2013, this website was redirected to Defendants' main branded website (www.tommiecopper.com).
[46]    *See* http://web.archive.org/web/20111028102828/http://www.tommiecopper.tv/ (accessed by searching for http://www.tommiecopper.tv/ in the Internet Archive index) and http://web.archive.org/web/20130126130957/http://www.tommiecopper.tv/ (accessed by searching for http://www.tommiecopper.tv/ in the Internet Archive index).



73.    Moreover, the frequently asked questions ("FAQ") section of the website repeats the account of Defendant Kallish's "traumatic water skiing accident" and how that incident led to the development of a revolutionary product that "provide[s] relief from arthritis and other joint pains, promote muscle recovery, and reduce inflammation":[47]

**Q. How was Tommie Copper started?**

Tommie Copper was founded by Tom Kallish, a middle-aged and self-professed weekend warrior, who suffered a traumatic water skiing accident requiring multiple surgeries on his back, knees and hips leaving him with chronic debilitating arthritic pain. Finding only uncomfortable, restrictive and bulky medical compression available, he created Tommie Copper compression wear.

---

[47]    http://web.archive.org/web/20111105023609/http://www.tommiecopper.com/faq (accessed by searching for http://www.tommiecopper.com/faq in the Internet Archive index).

This unique compression uses multi-directional support and proprietary copper-infused yarn to provide relief from arthritis and other joint pains, promote muscle recovery and reduce inflammation all while being comfortable enough to be worn throughout the entire day.

74.    Similarly, the website touts the medicinal benefits of copper to stimulate the immune system and repair injured tissue.  Moreover, they are designed to mislead consumers into believing that copper is a scientifically proven remedy for pain and injury relief:[48]

**How is copper used in medicine?**

Copper has been used in medicine for thousands of years, one of the world's oldest medical texts, the EBERS PAPYRUS states, "Treat inflammation with pulverized copper."  Copper also stimulates the immune system to fight infections, to repair injured tissues, and to promote healing.  Copper has been shown to neutralize "free-radicals" which can cause severe damage to cells.  Symptoms of copper deficiency include osteoporosis, osteoarthritis, and rheumatoid arthritis.

**How does the body use copper?**

Copper is necessary for the growth, development, and maintenance of bone, connective tissue, brain, heart, and many other body organs.  It is involved in the formation of red blood cells, the absorption and utilization of iron, and the synthesis and release of life-sustaining proteins and enzymes.  These enzymes in turn produce cellular energy and regulate nerve transmission, blood clotting, and oxygen transport.

Copper stimulates the immune system to fight infections, repair injured tissues, and promote healing. Copper also helps to neutralize "free-radicals" which can cause severe damage to cells.

Symptoms of copper deficiency include osteoporosis, osteoarthritis and rheumatoid arthritis.

75.    This message was repeated in subsequent and/or additional websites owned and operated by Defendants.  For example, prior to the official launch of its branded website (www.tommiecopper.com), Defendants represented on the landing page that "Tommie Copper is

---

[48]    *Id.*

designed to relieve pain 24 hours a day using Therapeutic Copper Compression (TCC)."[49]
Defendants try to differentiate Tommie Copper Products from other "ordinary, bulky compression
wear" by pointing to the use of its "revolutionary" and proprietary copper-infused fabric.



76.    Once again, Defendants include a fact section with similarly misleading language.
For example, the FAQ section states that "Tommie Copper is dedicated to helping people
suffering from pain improve their quality of life."[50]  Moreover, that Tommie Copper Products
"are designed to be worn by anyone seeking relief from daily aches and pains."[51]  This includes
"everyone from marathon runners to **arthritis sufferers**" or "everyone from Olympic runners to
grandmothers who like to garden":[52]

---

[49]    http://web.archive.org/web/20110208131748/http://www.tommiecopper.com/  (accessed
by searching for http://www.tommiecopper.com/ in the Internet Archive index).

[50]    http://web.archive.org/web/20110504135128/http://tommiecopper.com/faq (accessed by
searching for http://tommiecopper.com/faq in the Internet Archive index).

[51]    *Id.*

[52]    *Id.* (emphasis added); http://web.archive.org/web/20110820043922/http://www.tommie
copper.com/faq (accessed by searching for http://www.tommiecopper.com/faq in the Internet
Archive index).

Who wears Tommie Copper?

Tommie Copper products are designed to be worn by anyone seeking relief from daily aches and pains. Everyone from marathon runners to arthritis sufferers can benefit from the combination of copper infused yarn and the unmatched comfort provided by Tommie Copper Cu29 Copper Compression wear.

Who wears Tommie Copper?

Tommie Copper products are designed to be worn by anyone seeking relief from daily aches and pains. Everyone from Olympic runners to grandmothers who like to garden can benefit from the combination of copper infused yarn and the comfortable compression provided by Tommie Copper Compression wear.

77.    Defendants also extol the benefits of copper in the FAQ section and a separate section known called "Copper Facts" to mislead consumers into believing that copper is a scientifically proven remedy for pain and injury relief.  For example, Defendants represent: (1) "copper has been used in medicine for thousands of years;" (2) copper "has been shown to neutralize 'free-radicals';" and (3) "symptoms of copper deficiency include osteoporosis, osteoarthritis, and rheumatoid arthritis."[53]

78.    Defendants' website also prominently features customer testimonials in order to convey the message that Tommie Products are effective for pain relief and other serious ailments, including Lyme disease, arthritis, and MS.  The website also maintained a "One million stories of relief" section, and section titled "featured testimonial" noting "Tommie Copper has already transformed thousands of lives; how can Tommie Copper transform you?"  None of the advertisements,[54] however, disclose whether the results are typical:

> **Sonny** - New York - I'm Sonny, I'm 53 years old and I'm a contractor. The type of work I do is all lifting. I'm constantly abusing my body and it's been 32 years I've been doing this. So I need to get relief wherever I can. We're always putting back braces on and things like that to support our backs, but you can't work in

---

[53]    http://web.archive.org/web/20111005153718/http://www.tommiecopper.com/faq (accessed by searching for http://www.tommiecopper.com/faq in the Internet Archive index).
[54]    http://web.archive.org/web/20111228032325/http://www.tommiecopper.com/testimonials (accessed by searching for http://www.tommiecopper.com/testimonials in the Internet Archive index).

28

them. I was wearing the Tommie Copper shirt yesterday on the job, and it was fantastic. It was very comfortable, I could move, I could reach. It didn't pull or hold me back like other supports do. You don't even know that it's supporting you and that's what I liked about it. When I wear the Tommie Copper shirt, I can bend over and it gives me that little support, that edge so you can continue to work in comfort.

**Holly H.** - New York, NY - I started training for a marathon, which was the best thing I've ever done and I loved it. I started running a lot and of course my knee gave out, and I developed arthritis in my knee. I've been through about 4 or 5 different types of running sleeves from my doctor, and if they didn't slip (which they always did) they'd be so uncomfortable, tight and thick. And I felt the circulation was cut off in my legs and I had to take it off. So I was better off without the sleeve. But the Tommie Copper sleeve was so thin and comfortable I didn't feel it. When I have it on, I feel a difference. My knee wasn't aching, I could run, it didn't hurt and I'm totally sold.

**Joseph B.** - Bedford Hills, NY - When I was a young kid, I was affected by Lyme's Disease when I was bit by a tick. A side effects of Lyme's disease is arthritis, so I get pains all over my joints. Usually around 3 hours into work, I can barely feel my arms and I'm exhausted, but when I had the sleeve on, my elbow was no longer in pain. It was like having a brand new arm. It's amazing, it's really amazing.

**Fiona M.** - Bedford Hills, NY - I can't thank you enough for coming up with your Tommie Copper knee wrap. It is not an exaggeration to say that it really has transformed my life! I've had an arthritic knee for about four years – x-rays and MRIs show that the cartilage is totally worn away. I've been on Glucosamine and Chondroitin and MSM for three years I've taken hyaluronic acid supplements and have had hyaluronic acid and cortisone shots. Nothing has had the same effect as your wrap. It literally worked overnight. The real test came this past Saturday, when I spent the whole day gardening. I usually have to take a maximum dose of anti-inflammatories after a day of gardening to make sure that I can walk the next day. Thanks to the Tommie Copper wrap I needed no medication at all, and felt so great that I worked in the garden all Sunday too! This is an incredible product. Let me know when you come up with the full body suit – I'll be your first customer!

**Dewayne B** - Colorado Springs, CO - I was diagnosed with MS in 2009 and the last few months I have been getting a lot of joint pain in my elbows. I started to where the Tommie Copper sleeves for the last 3 weeks and I feel a BIG improvement in my elbows. I can't wait to order a Tommie Copper shirt. THANKS GUYS YOU ROCK!!!

**Nicole P.** - Whippany, NJ - Let me start off by saying that I am in no way, shape or form a doctor! But I can say that I will give my opinion and advice to products that I believe in. With that said, I am a firm believer in Tommie Copper and highly recommend it! I am a beginner runner and a mom of three who may have jumped into the love of running a bit too quickly. I injured my knee and developed Iliotibial Band syndrome with a bit of tendonitis in my right knee. I was advised to wear a knee brace and to discontinue running (or any cardio activity putting stress on the knees) for 4 weeks. Well doesn't that put a damper on a stressed out mom! Hopping around on a painful ache-y knee was really becoming a burden and I was a bit worried about my future long runs. I received a Tommie Copper knee sleeve and wasn't quite sure what to think about it but was excited none the less to try something different; a bit desperate to be honest. When I opened the package I had sort of a "bummer" reaction because of how lightweight the material was. I thought: "how could this possibly help with my pain. I need support." WELL, let me tell you, within the first 10 minutes of walking around I had very little, almost no more pain! I wore the sleeve for a few more hours and the pain literally dissipated. I will continue using their products and advise all my friends to check it out! Thank you Tommie Copper, this is one happy customer! Looking forward to trying some more of your products!

**Rosie S.** - Hawthorne, NY - In December 2009, I slipped and fell on a patch of black ice outside of my home. Since then, I've had excruciating pain in my shoulder. I tried physical therapy for months, but recently stopped going in May because it was a waste of time and money. Since wearing your Tommie Copper T-shirt, my pain is virtually gone. I was not able to lift my arms above my shoulders and I now have full range of motion. I can't thank you enough for this mini miracle.

**Dr. Stein** - Yorktown Heights, New York - I have been a practicing dentist for 15 years. I have been living with ongoing pain in my arm and elbow that has not allowed me to work to my fullest and has required me to take pain medication. When my patient Tom gave me his copper sleeve to try I was amazed. I can now throw a football 30 yards with my children and have not needed to take any medication what so ever. This has truly been not only a career changing experience, but also a life changing one as well. Thank you "Tommie Copper"

**Robert Z.** – California - After watching Montel I decided to give the Tommie Copper Knee Sleeve a try. I have never been a believer in any type of homeopathic remedy or copper bracelets or anything beyond the scope on Western Medicine without laboratory double-blind studies. My right knee has been so bad that I have been unable to boost myself into my four wheel drive truck without at least three tries because of the excruciating pain. I have also been unable to stand up out of

low couches or seats of any kind or to squat down without grabbing something and pulling myself up. Within twenty-four hours of wearing your Knee Sleeve I am able to do all of those things WITHOUT problem. I won't say that my knee pain is totally gone - but it is at least 80% resolved. I AM TOTALLY ASTOUNDED! Whatever magic the Knee Sleeve is doing, it is doing it exceptionally well - and I am not even going to question HOW. All I care about is that the thing actually works and is not an infomercial scam or junk! I have tried all manner of compression sleeves in the past and also frequently wear a knee brace. Nothing has ever given me any relief except your Knee Sleeve. My comments are an unsolicited recommendation of your products and I have no affiliation with your company nor am I soliciting compensation in any way. I just wanted to say THANK YOU - your products are a winning class act!

**Bertie M.** - Oxford, England - I recently arrived from Fiji. I had contracted some sort of infection and the plane ride to America made my ankles swell up like balloons. My brother, Luke who is a friend of Tom's picked me up at the airport and immediately gave me two Tommie Copper compression calf sleeves which Tom had given him. Within 24 hours, the swelling had completely gone away. I'm not sure what's in this stuff, but I can't thank you enough.

**Anja G**. - Los Angeles, CA - I am a former elite and Division 1 gymnast. I have competed for 16 years in gymnastics, enough to bang the body up more than a lil bit! My freshman year in college I was devastated with a torn ulna collateral ligament in my elbow. After reconstructive surgery, Tommy John surgery for all you baseball fanatics out there, and over a year of recovery my elbow never quite regained all its strength. I have tried wraps, and braces but there were all too bulky, cumbersome, and quite frankly were big but didn't give me the support in the joint I needed to keep teaching my classes pain free. Fast forward 9 years after surgery and I've still struggled to find something that could support me through my active lifestyle of being a nurse, a fitness trainer, and a health coach. I tried the Tommie Copper elbow sleeve and its sleekness enabled me to complete my movements in my workout but gave me that extra support and stability that kept me safe and for the first time, pain free!! I recommend these elbow sleeves if you have had surgery, or suffer from joint pain and arthritis. The lightweight makes them comfortable but doesn't take away from any of the support! Thank you Tommie Copper! :) My elbow loves you!

79.     Defendants continue to tout the efficacy of Tommie Copper Products for pain relief

through to 2015.[55]   Defendants' branded website has a slogan, "Life Hurts.  Feel Better."



80.    Defendants' website is also replete with misleading advertisements that stress the technology and features of Tommie Copper Products, which purportedly provide, among others benefits: (1) rejuvenating relief from everyday aches; (2) support for muscles and joints; (3) relief from stiffness and soreness; and (4) decrease in delayed onset muscle soreness.

---

[55]     http://web.archive.org/web/20150506163058/http://www.tommiecopper.com/   (accessed by searching for http://www.tommiecopper.com/ in the Internet Archive index).



81.     Defendants also utilized strategic marketing tactics such as event and foundation sponsorships with various not-for-profit organizations or medical foundations to promote their misleading advertising campaign.   For example, Defendants sponsored events held by the Arthritis Foundation (the leading nonprofit organization dedicated to the prevention, control and cure of arthritis), including the foundation's Jingle Bell Run/Walk in 2012 and 2013 to reinforce their misleading pain relief campaign.   Promotional releases for the 5k run/walk describe Defendants as "the leader in comfortable copper compression gear, and '**pain relief without a pill.**'"[56]

82.     Moreover, at the Jingle Bell Run/Walk in 2012, Defendants were at the race to hand out free Tommie Copper Products.[57]   Additionally, in 2013, a film crew was at the Jingle

---

[56]     http://web.archive.org/web/20150508132617/http://www.cliftonpark.org/arthritis-foundation-and-great-escape-partner-for-second-annual-jingle-bell-run/ (accessed by searching for http://www.cliftonpark.org/arthritis-foundation-and-great-escape-partner-for-second-annual-jingle-bell-run/ in the Internet Archive index) (emphasis added).

[57]     http://web.archive.org/web/20121111202015/http://www.tommiecopper.com/resources/blog/tommie-copper-sponsors-jingle-bell-run-arthritis     (accessed     by     searching     for http://www.tommiecopper.com/resources/blog/tommie-copper-sponsors-jingle-bell-run-arthritis in the Internet Archive index).

Bell Run/Walk to film part of Defendants' next infomercial.[58]

83.     Defendants also repeat these misrepresentations in various marketing materials and/or Product brochures.  For example, one of Tommie Copper's brochures regarding its Knee Sleeve states that Tommie Copper Products "**help relieve arthritis and other chronic joint and muscular pain**, promote muscle recovery and aid performance" and "decrease[] inflammation." A true and correct copy of the brochure featuring these misrepresentations is provided below:

---

[58]     Krystle S. Morey, *Running to beat the pain: 5K benefits Arthritis Foundation*, July 13, 2013,                 http://poststar.com/news/local/running-to-beat-the-pain-k-benefits-arthritis-foundation/article_53e1ffd8-ebfe-11e2-9b44-001a4bcf887a.html (last visited July 10, 2015).



84.     Similarly, Defendants' brochures highlight the purported "Power of Copper" and the ability of Tommie Copper Products to "relieve pain," neutralize "free radicals," "increase oxygen transport to muscles," and "speed recovery" or "speed muscle and joint recovery":



85.    Defendants' false and misleading advertising campaign also includes representations made on retail store display racks and Product packaging.   For example, Defendants represent on the back of Tommie Copper Products that the Products can provide: "reduce[d] fatigue," "speed[] muscle recovery," "restorative benefits," "improve[d] circulation," and "rejuvenating relief from aches and pains."   A true and correct copy of Product packaging featuring these misrepresentations is provided below:





86.    Defendants make the same representations on retail store display racks.



87.    Additionally, Defendants' false and misleading marketing campaign includes representations made on various social media websites.  For example, Defendants utilize Twitter as a platform to share reviews that are often solicited by Defendants to reinforce Defendants' misleading pain relief campaign.  Below are screenshots of Tommie Copper's solicitations:



88.    Defendants' social media posts also reiterate the benign pain reliving benefits of Tommie Copper Products, with phrases such as "Pain Relief without a pill!," "Live with Less Pain" or that the Products are designed to relieve "Arthritis, aches and pains in your hands and

fingers":







89.      Tommie Copper's social media posts state that Tommie Copper Products "[act] as

a support to aching joints/muscles & [deliver] the benefits of copper @ the point of your

discomfort," "[help] w/ pain/inflammation," and "are great for Chronic pain relief."



90.    Tommie Copper's social media posts also assert that the Products offer relief from arthritis pain and other chronic conditions:



### <u>The Peddlers and Purveyors of Tommie Copper's Miracle Cure</u>

91.     To promote its scheme, Defendants feature the endorsements of Defendant Kallish,

Tommie Copper's CEO, and Defendant Montel, a well-known celebrity spokesman.

92.      In a profile of Defendant Kallish in the 2012 spring issue of Moves Magazine,

Kallish prides himself on the "innovative" idea to utilize metallotherapy – a folklore remedy for

pain and inflammation – in an effort to relieve pain.   According to the profile reprinted on

Defendants' blog, Kallish made the following representations:[59]

> Two and a half years ago, I was involved in a serious water skiing accident that
> required multiple surgeries on my back, knees and hip. The <u>only therapies
> available</u> were <u>draconian medical compression products</u> and <u>heavy-duty narcotic
> pills</u>. Working in textiles, I was introduced to a technology company that was
> making exciting inroads infusing copper-oxide into a variety of mediums. Selfishly
> thinking, I set about creating a thinner, gentler compression garment for 24 hour

---

[59]     http://web.archive.org/web/20120530040324/http://www.tommiecopper.com/resources/
blog/ny-moves-magazine-features-tommie-copper (accessed by searching for http://www.
tommiecopper.com/resources/blog/ny-moves-magazine-features-tommie-copper in the Internet
Archive index) (emphasis added).

wear and combined it with the anti-inflammatory properties of copper, hoping I might find some relief.

I knew I had something larger when Montel Williams contacted me after receiving the product from a friend, ecstatic about the relief he found from his painful Multiple Sclerosis, and asked how he could join the company. I guess the irony is, with all of the modern advances in science, it took something that has been used for thousands of years in medicine—albeit approached in a new way—to find relief.

(When asked for the <u>scientific reasoning</u> behind Defendants' Products)

Compression counters swelling and inflammation that occurs from tissue over-use and the fluids that gather as a result of gravity. Copper has shown to repair damaged tissue and reduce inflammation by binding with copper-deficient enzymes once absorbed in the skin. By combining these two therapies, it allows for an ultra thin, gentle compression garment that can be worn alone or under clothing for a full 24 hours of relief.

93.     Additionally, Defendant Kallish personally appears on numerous advertisements and promotional materials, including many of the infomercials that aired nationwide.  Among other techniques, Kallish consistently uses his personal story of having suffered debilitating arthritis as a marketing strategy to promote Tommie Copper Products.  For example, Kallish appears in a lengthy infomercial with the subtitle "Tommie Copper helped him recover from devastating accident."  A true and correct screenshot from the infomercial[60] featuring Defendant Kallish is provided below:

---

[60]     https://www.youtube.com/watch?v=gqNwNEc-Gfg (last visited July 31, 2015).



94.    Moreover, in the FAQ section of Defendants' website, Defendants represent that Kallish created Tommie Copper Products after suffering a "traumatic water skiing accident requiring multiple surgeries on his back, knees and hips leaving him with chronic debilitating arthritic pain."[61]

How was Tommie Copper started?

Tommie Copper was founded by Tom Kallish, a middle-aged and self-professed weekend warrior who suffered a traumatic water skiing accident requiring multiple surgeries on his back, knees and hips leaving him with chronic debilitating arthritic pain. Finding only uncomfortable, restrictive and bulky medical compression available, he created Tommie Copper compression wear. This unique compression uses multi-directional support and proprietary copper-infused yarn to provide relief from arthritis and other joint pains, promote muscle recovery and reduce inflammation all while being comfortable enough to be worn throughout the entire day.

95.    In a video clip posted by Defendant Tommie Copper in 2014, Kallish described

_____

[61]    http://web.archive.org/web/20111105023609/http://www.tommiecopper.com/faq (accessed by searching for http://web.archive.org/web/20111105023609/http://www.tommie copper.com/faq in the Internet Archive index).

how he came to develop Tommie Copper Products:

> Back in 2010, I had a very serious water skiing accident, my body was really broken up, but my knee took the hit. At the same time, I started identifying the well-known benefits of compression. It became simple, design the most comfortable compression product available. I came up with a couple of prototype and I was pretty amazed. So I had a few more made up and I passed them to my friends and family. I was overwhelmed by the response. From there, the company was born.

96.    In a separate video introducing Defendant Kallish as the recipient of the 2014 Business Council of Westchester Entrepreneurial Success award, Kallish reiterated his personal story of having suffered a "serious accident" that led him to create the brand and company, stating: ". . . I lost every disc in my neck, all four discs in my back, both knees and both hips.  I went and develop this product made of copper yarn to mitigate my own pain.  It worked so well that I decided to start a company called Tommie Copper."[62]

97.    Defendant Montel also appears in numerous advertisements and promotional materials, including many of the infomercials that aired nationwide, touting the miraculous benefits of Tommie Copper.  For example, Montel appeared in an interview with Examiner.com published on May 24, 2012, expressing that he has been working with Defendants, "a company that has copper-infused cloth that is anti-bacterial, anti-microbial, anti-viral, but also has some other incredible capabilities when used in compression garments like pain relief, a mitigation of inflammation."[63]  Defendant Montel further represents that Defendants' Products "can reduce swelling," "increase mobility," and "increase blood flow."[64]

98.    Similar to Kallish, Defendant Montel uses his personal diagnosis with MS, a debilitating autoimmune disorder, to hawk the sale of Tommie Copper Products, which Montel

---

[62]    https://www.youtube.com/watch?v=eT37qftYI9E (last visited July 12, 2015).

[63]    Taylor Sparks, *Interview: Montel Williams on Living Well and the Health Master Elite, Examiner.com*, May 24, 2012, http://www.examiner.com/article/interview-montel-williams-on-living-well-and-the-health-master-elite-2 (last visited July 31, 2015).

[64]    *Id.*

refers to as "truly pain relief without a pill."[65]  For example, in a nationwide aired infomercial,[66]

Montel claims:

> When you're in pain, you can't focus on anything but the pain. Believe me, I know. Since my diagnosis with MS, I've been on a quest to relieve my pain. Tommie Copper compression wear works for me. I wear a Tommie Copper compression shirt when I work out and I no longer experience the usual aches and pains and the stiffness and I can work out longer and harder than I have been able to do for years.

99.    A true and correct screenshot from the video advertisement featuring Defendant Montel is provided below:



100.    In a separate 60-second spot that aired on cable television, Montel also makes the following claim:

> Since my diagnosis with MS more than a decade ago, <u>nothing's been more important to me than managing my pain</u>. I started wearing Tommie Copper compression shirts a few months ago and <u>I experienced a difference immediately</u>. Tommie Copper compression wear is made with an exclusively patented copper

---

[65]        https://www.youtube.com/watch?v=gqNwNEc-Gfg

[66]        https://www.youtube.com/watch?v=KliqEk4xn7M (last visited July 31, 2015).

infused fabric. <u>Copper is well known for its anti-inflammatory properties</u>, and <u>inflammation is one of the major causes of pain</u>.

101.    In one of Defendants' infomercials, Montel knocks on the door of an alleged pain sufferer and introduces himself as "[her] Tommie Copper delivery man."  Defendant Montel expresses that he heard the individual suffered from pains around her hands and instructs her to use a certain Tommie Copper Product for the next two weeks.[67]

102.    In that same infomercial, Defendant Kallish appears to talk about the Tommie Copper Products that he created and the remarkable benefits that can be obtained from their use:

> I had broken half of my body . . . ***I couldn't live in the pain I was in*** . . . If I didn't have that sleeve, I couldn't sleep at night . . . When I tell people this product works, ***I'm not telling you because I want you to buy one***, I'm telling you this works because uh, you know ***this basically saved my life***.[68]

103.    Further, Montel, as the consummate pitchman, emboldens the misleading advertising campaign, stating:  "The fact that you even recovered from this accident, to me, is just . . . a miracle."  Moreover, Montel continues to suggest that after personally wearing a certain Tommie Copper Product every day, for the past six months, he strongly believes that Tommie Copper Products "can give you your life back.  Period."[69]

104.    Separately, Montel appeared on an episode of The Dr. Oz Show (aired on February 9, 2012) and in a segment called "Best Breakthroughs to Fight Your Pain,"[70] Montel recommended a certain Tommie Copper Product, stating:

> . . . I had my left shoulder rebuilt in a surgery, which is a rotator cuff surgery and ***lost almost 15 percent of my mobility***. I started wearing this shirt two years ago. ***This shirt now has given me back about 9 to 10 percent of that mobility*** that I've lost … Less than a year ago I couldn't put both shoulders up so this has given me

---

[67]    https://www.youtube.com/watch?v=KliqEk4xn7M (last visited July 31, 2015).

[68]    *Id*. (emphasis added).

[69]    *Id.*

[70]    http://www.doctoroz.com/episode/has-montel-williams-discovered-fountain-youth    (last visited July 31, 2015) (emphasis added).

[sic] back. Now . . . *If you have a knee problem, a back problem we have a brace for you, knee problem, elbow, carpal tunnel syndrome* . . . .

105.    On that same Dr. Oz program, Defendant Montel suggests that the Tommie Copper compression gloves are effective for relieving pain associated with carpal tunnel syndrome, stating: "If you have a knee problem, elbows, carpal tunnel syndrome, ankles . . . ."[71]

106.    Montel even suggests the Tommie Copper boxer briefs can provide aphrodisiac benefits, stating: "Every lady in this room right now, you should be purchasing this [Tommie Copper boxer briefs] today. Let me tell you why, let me tell you why. Because copper, when infused this way and worn this way, increases blood flow."[72]

107.    To bolster the purported benefits of copper within the Products, Defendant Montel makes the following representation: "It's got copper in it, copper-oxide, that emits copper on your skin."[73]

108.    Defendants capitalized on the growing interest of the Tommie Copper Products by promoting the Products through Defendant Montel on the Dr. Oz Show. As Defendant Kallish notes,

> Montel took the shorts prototype on a national talk show with a well-known doctor, explaining how he uses Tommie Copper to aid in muscle recovery from stiffness and soreness and that it helps him to move with more comfort and ease during his workouts. Needless to say, the website was shut down with inquiries. A good problem to have, if only they weren't still prototypes![74]

109.    Defendants also capitalized on the growing interest of Tommie Copper Products by introducing a Tommie Copper Television Show hosted by Defendant Montel. The show was intended to introduce new products, and features stories of individuals who use Tommie Copper

---

[71]    *See* http://www.doctoroz.com/episode/has-montel-williams-discovered-fountain-youth?video_id=1848023120001
[72]    *Id.*
[73]    *Id.*
[74]    http://www.prweb.com/releases/2012/4/prweb9398614.htm

Products.

110.    In an announcement for the new show, Kallish again alluded to the pain he suffered after the accident, stating:  "After the accident, I just wanted to have my life back; a life not dulled by prescription drugs, uncomfortable products or limited mobility."[75]  Kallish's use of his personal story as a marketing tool is especially alluring to consumers on the hunt for benign pain relief treatment devoid of adverse side effects.

111.    Separately, Defendant Montel also made misleading representations about Defendants' Products on his verified Twitter and Facebook accounts, endorsing Tommie Copper Products as pain management products that can significantly relieve pain:



112.    These claims formed the groundwork of Defendants' extensive marketing campaign to sell Tommie Copper Products as a "revolutionary breakthrough" in pain management and injury relief or repair, and a slew of purportedly inflammation-related health conditions. Defendants' conduct is particularly egregious as it takes advantage of the anxieties of consumers and, particularly, individuals who suffer from pain or chronic pain on the hunt for pain relief

---

[75]    http://web.archive.org/web/20130303050203/http://news.yahoo.com/tommie-copper-releases-latest-tv-show-pain-relief-201634866.html (accessed by searching for http://web.archive.org/web/20111105023609/http://www.tommiecopper.com/faq in the Internet Archive index).

treatment, and the elderly who are particularly prone to joint pain issues such as arthritis and carpal tunnel syndrome.

### Defendants' Claims Concerning Benefits of Tommie Copper Products are False and Misleading

113.    Although Defendants have represented that the benefits of copper have been extolled for centuries and that copper has been shown to repair damaged tissue and reduce inflammation by binding with copper-deficient enzymes once absorbed in the skin, copper alone cannot be absorbed through the skin.[76]

114.    Scientific studies show that the permeability of copper is only improved when combined with a peptide.  Once combined with a peptide, permeability can thereafter be achieved through constant administration for a period over twenty-four hours.[77]

115.    Regardless, a deficiency in copper plays no role in the cause of certain diseases, such as rheumatoid arthritis.[78]  Rather, copper deficiency is likely a symptom and a consequence of arthritis and inflammation, not a cause.[79]

116.    Moreover, although copper is an essential trace element, critical for a variety of biological processes; for hemoglobin synthesis, enzyme activation, (i.e., superoxide dismutase),

---

[76]    L.M. Gaetke and C.K. Chow, *Copper toxicity, oxidative stress, and antioxidant nutrients*, Toxicology 189: 147-63 (2003).

[77]    Hostynek JJ, Dreher F, and Maibach HI. Human stratum corneum penetration by copper: in vivo study after occlusive and semi-occlusive application of the metal as powder. Food and chemical toxicology: an international journal published for the British Industrial Biological Research Association 44: 1539-1543, 2006; Gorter RW, Butorac M, and Cobian EP. Examination of the cutaneous absorption of copper after the use of copper-containing ointments. American journal of therapeutics 11: 453-458, 2004.

[78]    http://www.ncbi.nlm.nih.gov/pubmed/8353981/ (last visited July 31, 2015).  Claims that copper supplements are effective in the treatment of arthritis have not been accepted by the medical community.   http://www.mayoclinic.org/drugs-supplements/copper-supplement-oral-route-parenteral-route/description/drg-20070120 (last visited July 31, 2015).

[79]    http://www.dailymail.co.uk/health/article-1221015/Copper-bracelet-arthritis-cure-myth-say-scientists-casting-doubt-multi-million-pound-alternative-healthcare-industry.html       (last visited July 31, 2015).

or more generally as a key component of mitochondrial, cytoplasmic, and nuclear enzyme system, copper deficiency is extremely rare and most regular diets provide enough copper to meet the daily requirements.[80]  Supplementation is only needed in patients with other serious medical conditions that affect their gastrointestinal tract and impair their ability to absorb nutrients.  In reality, no modality of treatment has been shown to cure or reverse the changes of arthritis.

117.    Further, to the extent that some Tommie Copper Products incorporate zinc fiber, this serves antagonistic to copper, blocking copper absorption.[81]

118.    Moreover, studies and clinical research establish that Defendants' claims are affirmatively false and misleading.  Telling is Defendant Kallish's Keynote speech in 2014, which eludes to the placebo effect:[82]

> After my third operation I was living on pain medication … I was reading about different technologies that might mitigate pain, and I came across copper … through the aggregate knowledge of my past I was able to put copper into a yarn, make some products, and put them on the parts of my body that had pain. My whole motivation was to get off pain pills … I used them, I put them on they really worked, and ***convinced they were a placebo, I didn't care***. Because they worked.

119.    Contrary to Defendants' representations regarding the miraculous healing powers of copper, clinical studies demonstrate that copper has been shown to be no more effective than a placebo for pain relief for patients with arthritis.  One study showed that a copper-infused device does not improve joint swelling and tenderness, physical function, or inflammation.[83]

---

[80]      S.K. Chhetri, R.J. Mills, S. Shaunak, H.C. Emsley. *Copper deficiency*. BMJ. 348: 3691 (2014); K. Dembinski, A.E. Gargasz, S. Dabrow, L. Rodriguez. *Three distinct cases of copper deficiency in hospitalized pediatric patients.* Clin Pediatr (Phila). 51: 759-62 (2012).

[81]      M. Torre, A.R. Rodriguez, F. Saura-Calixto, *Effects of dietary fiber and phytic acid on mineral availability*.  Crit. Rev. Food Sci. Nutr. 3D(1):1-22 (1991).

[82]      https://www.youtube.com/watch?v=8GdxhpI-Dyc (last visited July 31, 2015).

[83]      S.J. Richmond, S. Gunadasa, M. Bland, H. MacPherson, *Copper Bracelets and Magnetic Wrist Straps for Rheumatoid Arthritis – Analgesic and Anti-Inflammatory Effects: A Randomized Double-Blind Placebo Controlled Crossover Trial*, PLoS ONE 8(9) e71529 (2013), available at

120.    Stewart Richmond, of York University, who led the trial, has stated:  "It appears that any perceived benefit obtained from wearing a . . . copper bracelet can be attributed to psychological placebo effects."  Moreover, he added, "I realize this may dispel the myth and puncture a few balloons, but I don't want to see people wasting their money."[84]

121.    Further, Eric Matteson, M.D., chair of rheumatology at the Mayo Clinic, in Rochester, Minn., called the study "very good evidence about their lack of efficacy." [85]

122.    Jane Tadman from Arthritis Research U.K. has stated that she was not surprised by the study's results.  "Copper bracelets and other devices such as copper insoles are heavily marketed towards people with both rheumatoid arthritis and osteoarthritis on a purely anecdotal basis and without any evidence that they actually work, and this study confirms this lack of effectiveness."[86]

123.    Similarly, a 2009 study found that the "[u]se of a copper bracelet over a period of 4 weeks had no demonstrable therapeutic benefit for patients with osteoarthritis."[87]

124.    Further, a randomized double blind placebo controlled trial of Copper-Salicylate gel, which was directly applied to the skin, was no better than a placebo gel as a pain reliever or

---

Doi:10.1371/journal.pone.0071529,    *available    at*    http://journals.plos.org/ plosone/article?id=10.1371/journal.pone.0071529 (last visited July 31, 2015.

[84]    http://www.dailymail.co.uk/health/article-1221015/Copper-bracelet-arthritis-cure-myth-say-scientists-casting-doubt-multi-million-pound-alternative-healthcare-industry.html    (last visited July 31, 2015).

[85]    http://www.arthritis.org/living-with-arthritis/treatments/natural/other-therapies/magnetic-copper-bracelets.php (last visited July 31, 2015).

[86]    http://www.webmd.com/rheumatoid-arthritis/news/20130918/copper-bracelets-rheumatoid-arthritis (last visited July 31, 2015).

[87]    S.J. Richmond, S.R. Brown, P.D. Campion, *et al.* Therapeutic effects of magnetic and copper bracelets in osteoarthritis: a randomised placebo-controlled crossover trial. Complementary Therapies in Medicine. 17(5–6):249–256 (2009).

providing pain relief for patients with osteoarthritis of the hip and knee.[88]

125.    Moreover, the U.S. Food & Drug Administration has chastised the sale of similar type products, including copper bracelets as arthritis remedies noting such conduct constitutes a "health fraud scam," is not likely to help, and "waste[s] money and can lead to serious delays in getting proper diagnosis and treatment . . . ."[89]

126.    Lastly, another study showed that wearing compression shorts during recovery from high intensity exercise "does not lead to greater delivery of energy substrates or enhanced glucose uptake when compared to non-compression clothing."[90]

127.    Similarly, Defendants' particular statements are contradicted by scientific literature and studies.  By way of illustration, Defendants' brochures and other advertisements highlight the purported "Power of Copper" and the ability of Tommie Copper Products to "relieve pain," neutralize "free radicals," "increase oxygen transport to muscles," and "speed recovery" or "speed muscle and joint recovery".  *See* ¶ 84, *supra*.  However, each of these statements are false and misleading, as illustrated below:

128.    *Increase oxygen transport to muscles:*    Oxygen is used in helping convert foodstuffs to energy that the body can use, i.e., adenosine triphosphate (ATP).  Copper's role in this process is as a cofactor for an enzyme (cytochrome c oxidase).  However, copper supplementation does not improve this process by increasing oxygen uptake or VO2max

---

[88]    N. Schackel, R.O. Day, B. Kellet, *Copper-salicylate gel for pain relief in osteoarthritis: a randomized controlled trial*, Med. J. of Austl. 167:134-36 (1997), *available at* http://espace.library.uq.edu.au/view/UQ:10099/copper.pdf (last visited July 31, 2015).

[89]    http://www.fda.gov/downloads/ForConsumers/ProtectYourself/HealthFraud/UCM302359.pdf (last visited July 31, 2015).

[90]    B. Sperlich, D-P Born, K. Kaskinoro, K.K. Kalliokoski, M.S. Laaksonen, *Squeezing the Muscle: Compression Clothing and Muscle Metabolism during Recovery from High Intensity Exercise*, PLoS One 8(4): e60923 (2013), *available at* http://journals.plos.org/plosone/article?id=10.1371/journal.pone.0060923 (last visited July 31, 2015).

(maximal oxygen consumption, the primary index for oxygen utilization in the body). In fact, one study showed copper supplementation over the course of one year did not result in any change in VO2max.[91]

129. *Neutralizes free radicals:* Antioxidants are substances that reduce or 'neutralize' free radicals. Copper is not an antioxidant and only plays an indirect role in the neutralization process. Specifically, a type of antioxidant called superoxide dismutase (SOD) relies on copper to act upon superoxide radicals. Copper SOD increases with exercise training but does so without any apparent increase in dietary copper intake.[92] Free copper ions actually have the capability of producing the opposite effect. In other words, copper can form highly reactive hydroxyl radicals that can initiate oxidative damage and have a deleterious effect on cell function.[93]

130. *Emits Ions:* Copper, an ion itself, has the capability to actually reduce absorption of other ions (e.g., zinc). However, copper complexing with a peptide has shown to have the greatest effect on the permeability coefficient. [94]

131. Moreover, Defendant Montel's other public statements dispel the veracity of his account that Tommie Copper Products help him cope with the pain of MS. For example, Defendant Montel recently gave an interview on April 13, 2015 on the Doctor Oz Show discussing his life with MS. During that interview, Montel indicated he utilized various mental techniques

---

[91]     *Zorbas YG, Charapakin KP, Kakurin VJ, Kuznetsov NK, Federov MA, and Popov VK*. Daily copper supplement effects on copper balance in trained subjects during prolonged restriction of muscular activity. Biological trace element research 69: 81-98, 1999.

[92]     *Lukaski HC.* Effects of exercise training on human copper and zinc nutriture. Advances in experimental medicine and biology 258: 163-170, 1989.

[93]     *Gaetke LM and Chow CK*. Copper toxicity, oxidative stress, and antioxidant nutrients. Toxicology 189: 147-163, 2003.

[94] *Pirot F, Millet J, Kalia YN, and Humbert P*. In vitro study of percutaneous absorption, cutaneous bioavailability and bioequivalence of zinc and copper from five topical formulations. Skin pharmacology . The official journal of the Skin Pharmacology Society 9: 259-269, 1996.

to manage his pain.[95]

132.    In another interview, Montel indicated that he deals with pain by taking 60 forms of supplements and hormonal replacements every day, liquefies 60 percent of his daily intake, and is part of a double blind study medical test at the University of Wisconsin.

133.    In another interview, Montel discusses utilizing prescription medication and medicinal marijuana to help deal with his pain:[96]

> Since my diagnosis, I have been prescribed almost every pain pill available. I have taken OxyContin, I've taken Percocet, Ultracet, Vicodin, Lortab and the list goes on. To the point that at one point my digestive system was so messed up I had to do multiple cleanses just to get me going again. I now utilize, through a prescription I have in the state of California, medicinal marijuana and utilize it in an edible form about 40 minutes before I go to sleep, and it has reduced my night tremors about 60% and has reduced the pain in my feet from 20% to 40%, depending on the level of pain. On any given day on a scale of 1 to 10, I walk around with my feet in a fire pit at a pain level of about 5. Medicinal marijuana can reduce that to about 3. Lortab or Vicodin can't even take the edge off.

134.    In fact, Defendant Montel has encouraged the use of medical marijuana as recently as June of this year, writing an op-ed published on Pennlive calling on House lawmakers to pass a medical marijuana bill.[97]  In a dramatic speech he stated:  "*It wasn't until I started using medical cannabis on a daily basis and getting my system saturated with cannaboids that I started getting relief*."[98]  In direct contradiction to former claims regarding the Products' efficacy in treating his pain associated with MS, Montel admits that "MS is a daily battle. *The only reason I'm even able to even write this today is because my doctor, a world class neurologist, recommended medicinal*

---

[95]    http://www.doctoroz.com/episode/montel-williams-how-he-defied-odds-and-how-you-can-too (last visited July 31, 2015).
[96]    http://www.medicinenet.com/script/main/art.asp?articlekey=53785 (last visited July 31, 2015).
[97]    http://www.pennlive.com/opinion/2015/06/with_medical_marijuana_bill_th.html#in cart_river (last visited July 31, 2015).
[98]    http://www.wpxi.com/news/news/state-regional/montel-williams-brought-tears-lobbying-medical-mar/nmbzD/ (emphasis added) (last visited July 31, 2015).

_marijuana. To this day, it's the only therapy that works for me._"[99]

135.    Thus, any suggestion that Tommie Copper Products (which incorporate a proprietary copper-infused thread) will relieve pain (including arthritis and other chronic joint and muscular pain), reduce inflammation, aid in injury management, accelerate or speed recovery, and/or improve muscular power or strength are both false and misleading.

**Plaintiffs' Purchases and Experiences with Defendants' Products**

**Plaintiff William Lucero**

136.    Within the class period, Plaintiff Lucero purchased one of the Tommie Copper Products manufactured, marketed, or sold by Defendants described and at issue in this Complaint, including: one elbow sleeve in or around 2014 for approximately $20.00.

137.    Mr. Lucero purchased the Tommie Copper Product from Walmart after viewing the various advertisements concerning the Tommie Copper Products, including the Product's packaging, commercials, and in-store advertisements referencing the ability to purportedly, among other benefits, relieve arthritis and other chronic joint and muscular pain, aid in injury management, accelerate or speed recovery, and improve in muscular power, strength, and endurance, prior to the time of purchase and understood them as a representation and warranty by Defendants that the Tommie Copper Products were effective for those purposes. He relied on these representations and warranties in deciding to purchase the Tommie Copper Products, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Tommie Copper Product if he had known that it was not in fact, proven to provide the aforementioned benefits. Plaintiff Lucero used the Tommie Copper Products as directed, but did not experience any of the purported benefits such as pain relief, injury

---

[99]    http://www.pennlive.com/opinion/2015/06/with_medical_marijuana_bill_th.html#incart_river

management aid, acceleration in recovery, or improvement in muscular power, strength, and endurance. The Tommie Copper Product was useless to Plaintiff Lucero, who would not have purchased the Tommie Copper Product, or would not have paid as much for the Product, had he known about the misleading nature of Defendants' representations concerning the Tommie Copper Products and/or that the Products were not effective for their advertised purposes.

**Plaintiff Rhonda Boggs**

138.    Within the class period, Plaintiff Boggs purchased multiple Tommie Copper Products manufactured, marketed, or sold by Defendants described and at issue in this Complaint, including: one knee sleeve in or around 2013 for approximately $30.00; one pair of Capri bottoms in or around 2014 (approximately one year later) for approximately $80.00; and one pair of socks in or around 2014 for approximately $30.00 (approximately six months after her second purchase).

139.    Ms. Boggs decided to purchase the Tommie Copper Products from www.TommieCopper.com after viewing the various advertisements concerning the Tommie Copper Products, including an infomercial that featured Defendant Montel and Defendant Kallish. After seeing the infomercials several times, she decided to go online and purchase the knee sleeve with a credit card. In the infomercial, Defendant Montel states "the benefits of copper have been extolled for centuries and athletes have used compression for decades to enhance performance"; "basically saved my life"; and "relief is an understatement." Plaintiff Boggs viewed the infomercial, which references the ability of Tommie Copper Products to purportedly, among other benefits, relieve arthritis and other chronic joint and muscular pain, aid in injury management, accelerate or speed recovery, and improve in muscular power, strength, and endurance, prior to the time of purchase and understood them as a representation and warranty by Defendants that the Tommie Copper Products were effective for those purposes. She relied on these

representations and warranties in deciding to purchase the Tommie Copper Products, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Tommie Copper Products if she had known that it was not in fact proven to provide the aforementioned benefits. Plaintiff Boggs used the Tommie Copper Products as directed but did not experience any of the purported benefits such as pain relief, injury management aid, acceleration in recovery, or improvement in muscular power, strength, and endurance. The Tommie Copper Products were useless to Plaintiff Boggs, who would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, had she known about the misleading nature of Defendants' representations concerning the Tommie Copper Products and/or that the Products were not effective for their advertised purposes.

### Plaintiff Jerome Jeffy

140.    Within the class period, Plaintiff Jeffy purchased one or more of the Tommie Copper Products manufactured, marketed, or sold by Defendants described and at issue in this Complaint, including: one short sleeve shirt in or around 2015 for approximately $50.00.

Mr. Jeffy purchased the Product from a Kmart in Riverhead, New York after viewing the various advertisements concerning the Tommie Copper Products, including the Product's packaging and infomercials featuring Defendant Montel and rodeo cowboy Shawn Minor referencing the ability to purportedly, among other benefits, relieve arthritis and other chronic joint and muscular pain, aid in injury management, accelerate or speed recovery, and improve muscular power, strength, and endurance, prior to the time of purchase and understood them as a representation and warranty by Defendants that the Tommie Copper Products were effective for those purposes. He relied on these representations and warranties in deciding to purchase the Tommie Copper Products, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Tommie Copper Products if he had known that

it was not in fact, proven to provide the aforementioned benefits.  Plaintiff Jeffy used the Tommie Copper Products as directed, but did not experience any of the purported benefits such as pain relief, injury management aid, acceleration in recovery, or improvement in muscular power, strength, and endurance.  The Tommie Copper Products were useless to Plaintiff Jeffy, who would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, had he known about the misleading nature of Defendants' representations concerning the Tommie Copper Products and/or that the Products were not effective for their advertised purposes.

### **Plaintiff Sandy Kontura**

141.    Within the class period, Plaintiff Kontura purchased multiple Tommie Copper Products manufactured, marketed or sold by Defendants described and at issue in this Complaint. Specifically, in or around 2013, Plaintiff Kontura purchased two pairs of women's compression gloves—one pair of standard compression gloves and one pair of fingerless gloves—both in size medium, for approximately $34.50 each.  Plaintiff Kontura later returned both pairs of gloves, and re-ordered only the standard women's compression gloves (with fingers) in size small.  Also in or around 2013, Plaintiff Kontura purchased two pairs of women's pants—one in size medium and one in size large—for approximately $69.50 each. Before purchasing the two pairs of pants, Plaintiff Kontura contacted Tommie Copper's customer service telephone line and spoke with a sales representative for more information regarding which pants would fit her best.  Based on the sales representative's recommendation, Plaintiff Kontura purchased one pair in each size. Plaintiff Kontura later returned the size medium pair of women's pants, and kept the size large pair.  Additionally, in the same order, Plaintiff Kontura purchased a black women's long-sleeve shirt in size medium for approximately $59.50.  When Tommie Copper later released new colors, Plaintiff Kontura exchanged the black medium long-sleeve shirt for a bright pink women's long-

sleeve shirt, also in size medium. After all returns and exchanges, Plaintiff Kontura was left with one pair of women's standard compression gloves in size small; one pair of women's pants in size large; and one women's long-sleeve shirt in size medium.

142.    Plaintiff Kontura purchased these Products from www.tommiecopper.com after viewing the various advertisements concerning the Tommie Copper Products, including infomercials featuring Defendant Montel (who Plaintiff Kontura describes as very convincing, and a substantial influence concerning her purchases), reviews, blogs, and Defendants' website(s) referencing the ability to purportedly, among other benefits, relieve arthritis and other chronic joint and muscular pain, aid in injury management, accelerate or speed recovery, and improve muscular power, strength, and endurance, prior to the time of purchase and understood them as a representation and warranty by Defendants that the Tommie Copper Products were effective for those purposes. She relied on these representations and warranties in deciding to purchase the Tommie Copper Products, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Tommie Copper Products if she had known that it was not in fact, proven to provide the aforementioned benefits. Plaintiff Kontura used the Tommie Copper Products as directed, but did not experience any the purported benefits such as pain relief, injury management aid, acceleration in recovery, or improvement in muscular power, strength, and endurance. The Tommie Copper Products were useless to Plaintiff Kontura, who would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, had she known about the misleading nature of Defendants' representations concerning the Tommie Copper Products and/or that the Products were not effective for their advertised purposes.

**Plaintiff George Potzner**

143.    Within the class period, Plaintiff Potzner purchased one or more of Tommie

Copper Products manufactured, marketed, or sold by Defendants described and at issue in this Complaint, including: one elbow sleeve in or around June 2013.

Defendants represented that the elbow sleeve was made with its copper-infused fabric and would, among other things, relieve Plaintiff Potzner's aches and pains caused by his arthritis and tendonitis. Plaintiff Potzner was deceived by Defendants' misrepresentations, including its commercials, regarding the alleged benefits of its copper-infused garments. Plaintiff Potzner did not receive the benefit of the bargain and suffered out-of-pocket loss as a result of Defendants' misrepresentations and improper statements and was damaged. Plaintiff Potzner relied on these representations and warranties in deciding to purchase the Tommie Copper Products, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Tommie Copper Products if he had known that it was not in fact, proven to provide the aforementioned benefits. Plaintiff Potzner used the Tommie Copper Products as directed but did not experience any the purported benefits such as pain relief, injury management aid, acceleration in recovery, or improvement in muscular power, strength, and endurance. The Tommie Copper Products were useless to Plaintiff Potzner, who would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, had he known about the misleading nature of Defendants' representations concerning the Tommie Copper Products and/or that the Products were not effective for their advertised purposes.

### Plaintiff Kathleen Bishop

144. Within the class period, Plaintiff Bishop purchased one or more of the Tommie Copper Products manufactured, marketed or sold by Defendants described and at issue in this Complaint. Specifically, in or around mid-2012, Plaintiff Bishop purchased one Tommie Copper women's knee sleeve—likely in size medium. Plaintiff Bishop does not recall the exact price she paid for the Product.

Plaintiff Bishop purchased the knee sleeve Product over the telephone with a credit card after viewing the infomercial featuring Defendant Montel Williams, referencing the Products' ability to purportedly, among other benefits, relieve chronic joint and muscular pain, aid in injury management, accelerate or speed recovery, and improve muscular power, strength, and endurance, prior to the time of purchase and understood them as a representation and warranty by Defendants that the Tommie Copper Products were effective for those purposes. She relied on these representations and warranties in deciding to purchase the Tommie Copper Product, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Tommie Copper Product if she had known that it was not in fact, proven to provide the aforementioned benefits.  Plaintiff Bishop used the Tommie Copper Product as directed, but did not experience any the purported benefits such as pain relief, injury management aid, acceleration in recovery, or improvement in muscular power, strength, and endurance.  The Tommie Copper Product was useless to Plaintiff Bishop, who would not have purchased the Tommie Copper Product, or would not have paid as much for the Product, had she known about the misleading nature of Defendants' representations concerning the Tommie Copper Products and/or that the Products were not effective for their advertised purposes.

### Plaintiff Raymond Henderson

145.    Within the class period, Plaintiff Henderson purchased one or more of the Tommie Copper Products manufactured, marketed or sold by Defendants described and at issue in this Complaint. Specifically, in or around late-2014, Plaintiff Henderson purchased one Tommie Copper back brace for approximately $60.00, and one knee sleeve for approximately $40.00.

146.    Plaintiff Henderson purchased the Products from either a Walmart, Walgreens, or CVS store located in Miami, Florida. To the best of his recollection, Plaintiff Henderson believes that he purchased the two Products a few days apart, and likely paid for the Products in cash.

Plaintiff Henderson purchased the Products after viewing the Products' packaging, various commercials, and an infomercial featuring Defendant Montel Williams, referencing the Products' ability to purportedly, among other benefits, relieve chronic joint and muscular pain, aid in injury management, accelerate or speed recovery, and improve muscular power, strength, and endurance, prior to the time of purchase and understood them as a representation and warranty by Defendants that the Tommie Copper Products were effective for those purposes. After viewing the infomercial featuring Montel Williams, Plaintiff Henderson called the phone number provided in the infomercial to purchase the Products, but decided to instead purchase the Products from a store to avoid shipping and handling charges.  Plaintiff Henderson relied on these representations and warranties in deciding to purchase the Tommie Copper Products, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Tommie Copper Products if he had known that it was not in fact, proven to provide the aforementioned benefits.  Plaintiff Henderson used the Tommie Copper Products as directed, but did not experience any the purported benefits such as pain relief, injury management aid, acceleration in recovery, or improvement in muscular power, strength, and endurance.  The Tommie Copper Products were useless to Plaintiff Henderson, who would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, had he known about the misleading nature of Defendants' representations concerning the Tommie Copper Products and/or that the Products were not effective for their advertised purposes.

147.    Prior to filing this action, Plaintiffs, by and through their counsel, provided Defendants with written notice of their claims pursuant to 15 U.S.C. § 2310(e) and any laws requiring pre-suit demand and notice.

### Defendants' False and Misleading Claims are Material

148.    The representations at issue are ubiquitous.  In commercial videos and/or

infomercials, on Product packaging, in retail stores, on their respective internet websites, and on Defendants' websites, Defendants make the same representations about Tommie Copper Products, namely that the Products relieve pain, including that from arthritis and other chronic joint and muscular pain, aid in injury management and/or repair injured tissue, accelerate or speed recovery, neutralize "free-radicals", and improve muscular power, strength, and endurance.

149.    All of Defendants' claims challenged herein relate to matters that are material and important to a consumer's purchasing decision, as they concern core claims about the Products which are likely to, and did, influence consumers' purchase of Tommie Copper Products.

150.    Defendants' marketing, advertising, and packaging materials intended to, and did, induce Plaintiffs and Class Members to rely upon Defendants' representations that Tommie Copper Products were effective for their intended use and in the way described.  These representations were a substantial factor in causing Plaintiffs and Class Members to purchase Tommie Copper Products over other effective pain relievers.

151.    At the time Plaintiffs and Class Members purchased the Tommie Copper Products, they were unaware of the fact that: (1) Defendants' claims that Tommie Copper Products relieve pain, including that from arthritis and other chronic joint and muscular pain, aid in injury management and/or repair injured tissue, accelerate or speed recovery, neutralize "free-radicals" and improve muscular power, strength, and endurance were false and misleading; and (2) Tommie Copper Products are not proven effective for their intended use.

152.    If Plaintiffs and Class Members had been aware of the true facts concerning the Tommie Copper Products, they would not have purchased the Products, or would not have paid as much for the Products.  Plaintiffs and members of the Class have been injured in fact and have suffered out of pocket losses.  Plaintiffs and members of the Class therefore seek a refund and/or rescission of the transaction and all further equitable and injunctive relief as provided by

applicable law.

## CLASS ACTION ALLEGATIONS

153.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a nationwide class (the "Nationwide Class"), of all persons in the United States who purchased Tommie Copper Products.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Jeffy also seeks to represent a sub-class of all Class members who purchased Tommie Copper Products in New York (the "New York Sub-Class").

154.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Lucero also seeks to represent a sub-class of all Class members who purchased Tommie Copper Products in California (the "California Sub-Class").

155.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Kontura also seeks to represent a sub-class of all Class members who purchased Tommie Copper Products in Ohio (the "Ohio Sub-Class").

156.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Boggs also seeks to represent a sub-class of all Class members who purchased Tommie Copper Products in Georgia (the "Georgia Sub-Class").

157.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Potzner also seeks to represent a sub-class of all Class members who purchased Tommie Copper Products in Iowa (the "Iowa Sub-Class").

158.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Bishop and Henderson also seek to represent a sub-class of all Class members who purchased Tommie Copper Products in Florida (the "Florida Sub-Class").

159.    The classes described in this Complaint will be jointly referred to as "Class," and proposed members in the classes will be jointly referred to as "Class Members."

160.    Plaintiffs reserve the right to amend or modify Class definitions with greater specificity or further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

161.    Excluded from the Class are: (i) Defendants and their employees, principals, affiliated entities, legal representatives, successors, and assigns; (ii) any entity in which Defendants have a controlling interest; and (iii) the judges to whom this action is assigned and any members of their immediate families

162.    The Court can define the Class and create additional subclasses as may be necessary or desirable to adjudicate common issues and claims of the Class Members if, based on discovery of additional facts, the need arises.

163.    The members of the Class are so numerous that their individual joinder herein is impracticable.  The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery.  Upon information and belief and based upon the scope of Defendants' marketing campaign, the Class includes tens of thousands of members.  Accordingly, joinder is impracticable.

164.    There are numerous questions of law and fact common to the Class which predominate over any individual actions or issues, including, but not limited to:

 a.    Whether Defendants violated the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*;

 b.    Whether Defendants breached any express warranties made to Plaintiffs and the Class;

 c.    Whether Defendants breached an implied warranty of merchantability made to Plaintiffs and the Class;

 d.    Whether Defendants were unjustly enriched by their conduct;

e.  Whether Defendants engaged, and continue to engage, in unfair or deceptive acts and practices in connection with the marketing, advertising, and sales of Tommie Copper Products;

f.  Whether Defendants violated other consumer protection statutes, false advertising statutes, or state deceptive business practices statutes; and

g.  Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and Class Members are entitled to restitution, injunctive, and/or monetary relief and, if so, the amount and nature of such relief.

165.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs and Class Members were exposed to Defendants' false, misleading, and deceptive marketing concerning Tommie Copper Products and were subject to Defendants' unjust, unreasonable, and unlawful practices.  Plaintiffs have no interests antagonistic to the interests of other members of the Class.

166.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of Class Members they seek to represent, they have retained counsels competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.

167.    Plaintiffs will fairly and adequately represent and protect the interests of Class Members, and common issues predominate.

168.    Notice of this class action can be provided to Class Members by techniques and forms similar to those customarily used in other class actions, such as by published notice, Internet notice, first-class mail or a combination thereof, or other means deemed suitable for this Class.

169.    Class certification is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the Class, making class-wide relief appropriate.

170.    In addition, the class mechanism is superior to other available means for the fair

and efficient adjudication of the claims of Plaintiffs and Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### (Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.)

171.    Plaintiffs and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

172.    Plaintiffs bring Count I individually and on behalf of members of the Nationwide Class and Sub-Classes against Defendants.

173.    The amounts in controversy of Plaintiffs' claims are at least or more than the sum or value of twenty-five ($25) dollars.

174.    Defendants' Products are consumer products, as defined in 15 U.S.C. § 2301(1).

175.    At all relevant times, Defendants were, and are, supplier(s) and warrantor(s) as defined in 15 U.S.C. § 2301 (4) and (5).

176.    In connection with the sale of Tommie Copper Products, Defendants' written warranties, as defined in 15 U.S.C. § 2301(6), warranted that the copper-infused Products:  (i)

relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance (collectively, the "Express Warranties" or "Misrepresentations").

177.    In fact, Tommie Copper Products do not conform to the Express Warranties because each of the Express Warranties is false and misleading.  Furthermore, clinical studies discussed herein refute these warranties.

178.    Additionally, Defendants impliedly warranted, as defined in 15 U.S.C. § 2301(7), in connection with the sale of Tommie Copper Products that the Products were of merchantable quality.

179.    Defendants breached the warranty implied in the contract for the sale of Tommie Copper Products in that the Tommie Copper Products are not effective for providing pain relief, including arthritis and other chronic joint and muscular pain; do not aid in injury management and/or repair injured tissue; do not accelerate or speed recovery; and do not improve muscular power, strength, and endurance.  Thus, Tommie Copper Products could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose in that they are not generally recognized among qualified experts as safe and effective for the advertised purposes.  Furthermore, the Tommie Copper Products do not conform to the promises or affirmations of fact made in the advertisements, packaging, and labeling of the Products.  As a result, Plaintiffs and Class Members did not receive the goods as impliedly warranted by Defendants to be merchantable.

180.    By reason of Defendants' breach of their express and implied warranties, Defendants violated statutory rights owed to Plaintiffs and Class Members pursuant to the

Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiffs and Class Members.

181.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendants' breaches because they would not have purchased or paid as much for Tommie Copper Products if the true facts had been known to them.

182.    Prior to filing this action, Plaintiffs, by and through their counsels, provided Defendants with written notice of their claims pursuant to 15 U.S.C. § 2301(e).

## COUNT II
### (Negligent Misrepresentation)

183.    Plaintiffs and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

184.    Plaintiffs bring Count II individually and on behalf of members of the Nationwide Class and Sub-Classes against Defendants.

185.    Defendants had a duty to disclose to Plaintiffs and Class Members correct information as to the quality and characteristics of Tommie Copper Products because Defendants were in a superior position than Plaintiffs and Class Members, such that reliance by Plaintiffs and Class Members was justified.  As the designer, manufacturer, marketer, distributor, and/or seller of Tommie Copper Products, Defendants possessed the skills and expertise to know the type of information that would influence a consumer's purchasing decision.

186.    During the applicable Class Period, Defendants negligently or carelessly misrepresented, omitted, and concealed from consumers material facts regarding the quality and characteristics of Tommie Copper Products, including the alleged benefits from the copper-infused fabric.  Defendants made such false and misleading statements and omissions through a wide range of advertisement medium described herein, with the intent to induce Plaintiffs and

Class Members to purchase Tommie Copper Products.

187.    Defendants were careless in ascertaining the truth of their representations in that they knew or should have known that Plaintiffs and Class Members would not realize the alleged benefits represented by Defendants.

188.    Plaintiffs and Class Members were unaware of the falsity in Defendants' misrepresentations and omissions and, as a result, justifiably relied on them when making the decision to purchase Tommie Copper Products.  Plaintiffs and Class Members would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.

### COUNT III
### (Unjust Enrichment)

189.    Plaintiffs and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

190.    Plaintiffs bring Count III individually and on behalf of members of the Nationwide Class and Sub-Classes against Defendants.

191.    At all relevant times during the applicable Class Period, Defendants designed, manufactured, produced, marketed, and/or sold Tommie Copper Products.

192.    Defendants directly benefitted at the expense of Plaintiffs and Class Members who paid for Tommie Copper Products as a result of Defendants' deceptive, fraudulent, and misleading advertising, marketing, and sales of the copper-infused Tommie Copper Products.

193.    Plaintiffs and Class Members conferred non-gratuitous benefits upon Defendants by buying and paying the purchase price for Tommie Copper Products directly to Defendants. Defendants accepted or retained such non-gratuitous benefits with full knowledge that Plaintiffs and Class Members were not receiving products of the nature and quality that Defendants

represented.

194.    By virtue of the unlawful conduct described herein, it would be unjust and inequitable for Defendants to retain the non-gratuitous benefits conferred.  Therefore, Plaintiffs and Class Members are entitled to, and hereby seek, disgorgement and restitution of wrongful profits, revenue, and benefits conferred upon Defendants in a manner established by the Court

## CALIFORNIA

## COUNT IV
**(Breach of Express Warranty, Cal. Com. Code § 2313)**

195.    Plaintiff Lucero and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

196.    Plaintiff Lucero brings Count IV individually and on behalf of members of the California Sub-Class against Defendants.

197.    By making the Express Warranties, Defendants, as a manufacturer, marketer, distributor, and/or seller, expressly warranted that the Tommie Copper Products were fit for their intended purpose by making the Express Warranties.

198.    The foregoing representations were material because they concerned alleged efficacy of Tommie Copper Products regarding the ability to provide pain relief, aid in injury management, and/or repair injured tissue; accelerate or speed recovery; and improve muscular power, strength, and endurance.  These representations had an influence on consumers' decisions in purchasing Tommie Copper Products.

199.    Defendants made the above representations to induce Plaintiff Lucero and members of the California Sub-Class to purchase Tommie Copper Products.  Plaintiff Lucero and the California Sub-Class Members relied on the representations when purchasing Defendants' Products.

200.    However, the Tommie Copper Products do not conform to the above express representations because each of the Express Warranties is false and misleading.

201.    Plaintiff Lucero and the California Sub-Class Members were injured, and continued to be injured, as a direct and proximate result of Defendants' breach because they would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.[100]

**COUNT V**
**(Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2313)**

202.    Plaintiff Lucero and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

203.    Plaintiff Lucero brings Count V individually and on behalf of members of the California Sub-Class against Defendants.

204.    Defendants, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that Tommie Copper Products were fit for their intended purpose in that the Products would (i) relieve pain, including arthritis and other chronic joint and muscular pain;(ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.  Defendants did so with the intent to induce Plaintiffs and Class Members to purchase Tommie Copper Products.

205.    Defendants breached the warranties implied in the contract for the sale of Tommie Copper Products in that Tommie Copper Products could not pass without objection in the trade under the contract description, the goods were not of fair or average quality within the description, the goods were unfit for their intended and ordinary purpose, and the Products do not conform to

---

[100]    Though, Plaintiff Lucero would still be interested in purchasing Tommie Copper Products in the future if the representations made by Defendants concerning the Products were true.

the affirmations of fact and/or promises made on the Products' packaging and labeling.  As a result, Plaintiffs and California Sub-Class Members did not receive the goods as impliedly warranted by Defendants to be merchantable.

206.    In reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose, Plaintiff Lucero and the California Sub-Class Members purchased Tommie Copper Products to relieve aches and pains, aid in injury management and/or repair injured tissue, accelerate or speed recovery and improve muscular power, strength, and endurance.

207.    Neither Plaintiff Lucero nor the California Sub-Class Members altered Defendants' Products after purchase.

208.    Plaintiff Lucero and the California Sub-Class Members were injured as a direct and proximate result of Defendants' breach because they would not have purchased Tommie Copper Products or paid as much for Tommie Copper Products if the true facts had been known to them.

**COUNT VI**
**(Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*)**

209.    Plaintiff Lucero and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

210.    Plaintiff Lucero brings Count VI individually and on behalf of members of the California Sub-Class against Defendants.

211.    This cause of action is brought pursuant to the Consumers Legal Remedies Act (the "CLRA"), California Civil Code §§ 1750, *et seq.*  Plaintiff Lucero is a consumer under California Civil Code §1761(d); Tommie Copper Products are goods within the meaning of the Act.

212.    Prior to filing this action, Plaintiff Lucero purchased one or more Tommie Copper

Products for personal use.

213.    Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by California Civil Code §1770(a) in its transactions with Plaintiff Lucero and California Sub-Class Members which were intended to result in, and did result in, the sale of Tommie Copper Products.

214.    CLRA § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."  Defendants violated this provision by making the Misrepresentations.

215.    CLRA § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."  Defendants violated this provision by making the Misrepresentations

216.    CLRA § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."  Defendants violated this provision by making the Misrepresentations.

217.    CLRA § 1770(a)(14) prohibits "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve."  Defendants violated this provision by making the Misrepresentations.

218.    CLRA § 1770(a)(16) prohibits "[r]epresenting the subject of a transaction has been supplied in accordance with a previous representation when it has not."  Defendants violated this provision by making the Misrepresentations.

219.    Defendants violated the CLRA by making false or deceptive or misleading representations about the Tommie Copper Products as described above, when they knew, or should have known, that the representations and advertisements were false and/or misleading.

220.    Plaintiff Lucero and California Sub-Class Members reasonably relied upon

Defendants' representations regarding the qualities and attributes of Tommie Copper Products.

221.    Plaintiff Lucero and California Sub-Class Members were deceived by Defendants' representations as to the qualities and attributes of Tommie Copper Products, including but not limited to, the Misrepresentations.  Plaintiff Lucero and California Sub-Class Members would not have purchased Tommie Copper Products, or would not have paid as much for the Products, had they known the true nature of these Products.

222.    Plaintiff Lucero and California Sub-Class Members seek an order of this Court awarding Plaintiff Lucero and proposed Class Members prospective and retrospective injunctive relief, and attorneys' fees and costs as allowed by statute.

223.    In addition, the CLRA has enhanced penalties for acts perpetrated against senior citizens and disabled persons.  If the defendant's conduct is directed at a class of persons who are senior citizens and/or disabled, a $5,000.00 civil penalty may be awarded to "each class member." Cal. Civ. Code § 1780(b).  A "disabled person" is someone who has "physical or mental impairment which substantially limits one of more major life activities." Cal. Civ. Code § 1761(f), (g).  Under California law, individuals suffering from arthritis are "disabled."  Defendants' conduct is clearly directed at senior citizens, who are the primary demographic afflicted with arthritis, as Tommie Copper Products are intended to, and advertised to, treat and/or alleviate arthritis.  Accordingly, the Court may award a civil penalty of up to $5,000.00 for each Class Member.

### COUNT VII
### (False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*)

224.    Plaintiff Lucero and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

225.    Plaintiff Lucero brings Count VII individually and on behalf of members of the

California Sub-Class against Defendants.

226.    Plaintiff Lucero has standing to pursue this claim because he suffered injury in fact as a result of Defendants' actions as forth herein.  Prior to filing this action, Plaintiff Lucero purchased Tommie Copper Products in reliance upon Defendants' advertising or marketing claims.

227.    Defendants' business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising under California Business and Professions Code section 17500, *et seq.* because Defendants advertise Tommie Copper Products in a manner that is untrue and misleading, and that Defendants knew or reasonably should have known their advertisements to be untrue and/or misleading.  In fact, Defendants' Products fail to perform or conform as advertised because copper-infused products do not relieve pain, including arthritis and other chronic joint and muscular pain; do not aid in injury management and/or repair injured tissue; do not accelerate or speed recovery; and do not improve muscular power, strength, and endurance.

228.    Defendants' wrongful business practices caused injury to Plaintiff Lucero and California Sub-Class Members.

229.    California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

230.    Defendants committed acts of false advertising, as defined by § 17500, by making the Misrepresentations.

231.   Defendants knew or should have known, through the exercise of reasonable care that the Misrepresentations were untrue and/or misleading.

232.   Defendants' actions in violation of § 17500 were false and misleading such that the general public is, and was, likely to be deceived.

233.   Plaintiffs, the Class, and California Sub-Class Members suffered lost money or property as a result of Defendants' FAL violations because they would not have purchased Tommie Copper Products, or would not have paid as much for them, if they knew the truth about the Products.

234.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff Lucero and the California Sub-Class Members seek an order of this Court enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in the Complaint.

235.   Plaintiff Lucero and the California Sub-Class also seek an order for disgorgement and restitution of all monies from sale of Tommie Copper Products, which were unjustly acquired through its wrongful business practice.

### COUNT VIII
### (Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

236.   Plaintiff Lucero and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

237.   Plaintiff Lucero brings Count VIII individually and on behalf of members of the California Sub-Class against Defendants.

238.   Defendants are subject to the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or

misleading advertising . . . ."

239.    Defendants' conduct, described herein, violated the "unlawful" prong of the UCL by violating the CLRA and FAL (*see infra* at Count VI and VII).

240.    Defendants' conduct, described herein, violated the "fraudulent" prong of the UCL by making the Misrepresentations.

241.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein constitute "unfair" business acts and practices under the UCL.  Defendants' conduct offends public policy against false advertising.  Federal law states that an advertisement must be truthful, not misleading.  Defendants' conduct is also immoral, unethical, and unscrupulous because it seeks to capitalize on consumer's desire for pain relief products through false and misleading representations.  Thus, the injuries suffered by Plaintiff Lucero and the California Sub-Class Members outweigh any conceivable benefit to consumers or competition that may derive from Defendants' conduct.

242.    Plaintiffs, the Class, and California Sub-Class Members suffered lost money or property as a result of Defendants' UCL violations because they would not have purchased Tommie Copper Products, or would not have paid as much for them, if they knew the truth about the Products.

243.    Plaintiff Lucero and the California Sub-Class Members seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, or fraudulent acts and practices, and to commence a corrective advertising campaign.

## GEORGIA

### COUNT IX
### (Breach of Express Warranty, Ga. Code Ann. § 11-2-313)

244.    Plaintiff Boggs and Class Members re-allege and incorporate by reference each

and every allegation set forth above, and further allege as follows:

245.    Plaintiff Boggs brings Count IX individually and on behalf of members of the Georgia Sub-Class against Defendants.

246.    Defendants made affirmations of fact and/or promises regarding the efficacy of Tommie Copper Products concerning the ability to (i) relieve pain, including arthritis and other chronic joint and muscular pain;(ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance, all of which became part of the basis of the bargain.

247.    Pursuant to Official Code of Georgia Annotated § 11-2-313, Express Warranties were formed regarding Tommie Copper Products, including an Express Warranty that the Tommie Copper Products conform to Defendants' affirmations and promises about the Products.

248.    However, the Tommie Copper Products do not conform to the above affirmations of fact and/or promises because each of the Express Warranties is false and misleading, as explained in detail herein.

249.    Plaintiff Boggs and the Georgia Sub-Class Members were injured, and continued to be injured, as a direct and proximate result of Defendants' breach because they would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.[101]

## COUNT X
**(Breach of Implied Warranty of Merchantability, Ga. Code Ann. § 11-2-314)**

250.    Plaintiff Boggs and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

---

[101]    Though, Plaintiff Boggs would still be interested in purchasing Tommie Copper Products in the future if the representations made by Defendants concerning the Products were true.

251.    Plaintiff Boggs brings Count X individually and on behalf of members of the Georgia Sub-Class against Defendants.

252.    Tommie Copper Products were subject to an implied warranty of merchantability pursuant to Official Code of Georgia Annotated § 11-2-314, which was not excluded or modified.

253.    Defendants, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that Tommie Copper Products were fit for their intended purpose in that that the Products would (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.  Defendants did so with the intent to induce Plaintiffs and Class Members to purchase Tommie Copper Products.

254.    Defendants breached the warranties implied in the contract for the sale of Tommie Copper Products in that the Products could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, the Products were unfit for their intended and ordinary purpose for which the Products are used, and the Products do not conform to the affirmations of fact and/or promises made on the Products' packaging and labeling.  As a result, Plaintiff Boggs and members of the Georgia Sub-Class did not receive the goods as impliedly warranted by Defendants to be merchantable.

255.    In reliance upon Defendants' skill and judgment and the implied warranty of merchantability, Plaintiff Boggs and members of the Georgia Sub-Class purchased Tommie Copper Products for use to (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.

256.    The Tommie Copper Products were not altered by Plaintiff Boggs or members of the Georgia Sub-Class.

257.    Plaintiff Boggs and the Georgia Sub-Class Members were injured, and continued to be injured, as a direct and proximate result of Defendants' breaches because they would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.

**COUNT XI**
**(Fair Business Practices Act, Ga. Code Ann. § 10-1-393)**

258.    Plaintiff Boggs and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

259.    Plaintiff Boggs brings Count XI individually and on behalf of members of the Georgia Sub-Class against Defendants.

260.    Pursuant to Official Code of Georgia Annotated § 10-1-393, Defendants had a statutory duty under Georgia law to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of Tommie Copper Products to consumers, including Plaintiff and Sub-Class Members.

261.    As alleged in this Complaint, Defendants engaged, and continue to engage, in unfair and deceptive acts and practices in connection with the sale of Tommie Copper Products, including, without limitation, misrepresenting the benefits of Tommie Copper Products and their ability to (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.

262.    Defendants violated, and continue to violate, statutory prohibitions against engaging in unlawful acts and practices by, *inter alia,* representing to consumers that Tommie Copper Products (goods) have characteristics, uses, or benefits that they do not possess.  Ga. Code Ann. § 10-1-393(b)(5).  In fact, the Products fail to perform or conform as represented because

81

the Tommie Copper copper-infused Products do not increase performance; accelerate recovery; improve muscular power, strength, and endurance; or relieve pain, including arthritis and other chronic joint and muscular pain.

263.   Defendants further violated, and continue to violate, Georgia's Fair Business Practices Act by advertising the Products with intent not to sell them as advertised.  Ga. Code Ann. § 10-1-393(b)(9).

264.   The foregoing acts and practices were directed, and continue to be directed, at unsuspecting consumers.

265.   Plaintiff Boggs and the Georgia Sub-Class Members were injured, and continued to be injured, as a direct and proximate result of Defendants' unfair and deceptive business practices because they would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.

266.   Prior to filing this action, Plaintiff Boggs, by and through her counsel, provided Defendants with written notice of her claims.

## IOWA

### COUNT XII
**(Private Right of Action for Consumer Frauds Act, Ia. Code Ch. 714H)**

267.   Plaintiff Potzner and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

268.   Plaintiff Potzner brings Count XII individually and on behalf of members of the Iowa Sub-Class against Defendants.

269.   Pursuant to Iowa law, Ia. Code Ch. 714H, Defendants had a statutory duty to refrain from unfair, deceptive, and/or fraudulent acts or practices in the manufacture, promotion, and sale of the copper-infused Tommie Copper Products to Plaintiff and the Iowa Sub-Class

Members.

270.    Defendants violated this statutory prohibition against engaging in unlawful acts and practices by, *inter alia*, making the misrepresentations and omissions of material facts, as alleged herein, with the "intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission" in connection with the sale of their Tommie Copper Products.  Iowa Code Ann. § 714H.3.

271.    Specifically, in connection with the sale of its consumer merchandise, Defendants engaged in unfair and deceptive acts and practices, as alleged in this Complaint, including, without limitation:

i.    Unfairly and deceptively misrepresenting the benefits of their copper-infused garments to customers;

ii.    Unfairly and deceptively advertising that the Products will rejuvenate and revive a consumer's body;

iii.    Unfairly and deceptively advertising that the Products will relieve a consumer's aches and pains;

iv.    Unfairly and deceptively stating that the Products will increase oxygen transportation;

v.    Unfairly and deceptively advertising that the Products will improve both muscle mobility and recovery;

vi.    Unfairly and deceptively selling garments that failed to perform and/or conform to Defendants' representations and/or descriptions of the Products.

272.    Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiff and the Iowa Sub-Class Members.

273. Defendants' deceptive representations and material omissions to Plaintiff and the Class Members constitute unfair and deceptive acts and practices under Iowa Law.

274. Defendants prohibited practices, as outlined herein, related to material facts.

275. Defendants intended that Plaintiff and the Iowa Sub-Class Members rely on their materially deceptive advertisements and misrepresentations and purchase the Tommie Copper Products as a consequence of the deceptive practices.

276. Plaintiffs and the Class Members were actually deceived by Defendants' misrepresentations.

277. Plaintiff Potzner and the Iowa Sub-Class Members were injured, and continued to be injured, as a direct and proximate result of Defendants' unfair and deceptive conduct because they would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.[102]

278. Prior to filing this suit, counsel for Plaintiff Potzner received approval from the Attorney General of Iowa pursuant to Iowa Code § 714H.7.

## COUNT XIII
### (Breach of Express Warranties, Ia. Code § 554.2313)

279. Plaintiff Potzner and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

280. Plaintiff Potzner brings Count XIII individually and on behalf of members of the Iowa Sub-Class against Defendants.

281. Defendants made affirmations of fact or promises regarding the efficacy of Tommie Copper Products concerning the ability to (i) relieve pain, including arthritis and other

---

[102] Though, Plaintiff Potzner would still be interested in purchasing Tommie Copper Products in the future if the representations made by Defendants concerning the Products were true.

chronic joint and muscular pain;(ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance, all which became part of the basis of the bargain.

282.    Pursuant to Ia. Code § 554.2313, Express Warranties were formed regarding Tommie Copper Products, including an Express Warranty that the Tommie Copper Products conform to Defendants' affirmations and promises about the Products.

283.    However, the Tommie Copper Products do not conform to the above affirmations of fact and/or promises because each of the Express Warranties is false and misleading, as explained in detail herein.

284.    Defendants' affirmations and promises were material to Plaintiff Potzner and the Iowa Sub-Class, and were part of the basis of the bargain in determining whether to purchase the Tommie Copper Products.

285.    Plaintiff Potzner and the Iowa Sub-Class relied on the Express Warranties in purchasing the Products.

286.    Defendants knew or should have known that, in fact, said representations and Express Warranties were false, misleading, and untrue.  Defendants further knew Plaintiff and the Class relied on the Express Warranties when purchasing the Tommie Copper Products.

287.    Within a reasonable time after Plaintiff Potzner knew or should have known of such breach, Plaintiff, on behalf of himself and members of the Class, placed Defendants on notice thereof.

288.    Plaintiff Potzner and the Iowa Sub-Class Members were injured, and continued to be injured, as a direct and proximate result of Defendants' breach because they would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.

## COUNT XIV
### (Negligent Misrepresentation)

289.    Plaintiff Potzner and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

290.    Plaintiff Potzner brings Count XIV individually and on behalf of members of the Iowa Sub-Class against Defendants.

291.    Under Iowa law, one who, in the course of his or her business, profession, or employment, or in any other transaction in which he or she has a pecuniary interest supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information if he or she fails to exercise reasonable care or competence in obtaining or communicating the information.

292.    Defendants had, and have, a duty to disclose to Plaintiff and members of the Class the actual quality and characteristics of the Tommie Copper Products.

293.    Privity exists because Defendants expressly warranted to Plaintiff Potzner and the Iowa Sub-Class that the Tommie Copper Products would perform in a certain way and offer specific health benefits.

294.    During the Class Period, Defendants negligently and/or carelessly misrepresented, omitted, and concealed from consumers, including Plaintiff Potzner and the Iowa Sub-Class Members, material facts relating to the quality and characteristics of the Tommie Copper Products, including the alleged physical benefits from the copper-infused fabric.  Defendants made such false and misleading statements and omissions on its website and in its advertisements and packaging with the intention of inducing Plaintiff and members of the Iowa Sub-Class to purchase the Products.

295.    Defendants were careless in ascertaining the truth of their representations in that

they knew or should have known that the represented benefits would not be realized by Plaintiff and the Iowa Sub-Class.

296.    Plaintiff Potzner and members of the Iowa Sub-Class were unaware of the falsity of Defendants' misrepresentations and omissions and, as a result, justifiably relied on them in deciding to purchase Tommie Copper Products.

297.    Plaintiff Potzner and the Iowa Sub-Class Members were injured, and continued to be injured, as a direct and proximate result of Defendants' misrepresentations because they would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.

## NEW YORK

### COUNT XV
### (Deceptive Acts or Practices, New York Gen. Bus. Law § 349)

298.    Plaintiff Jeffy and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

299.    Plaintiff Jeffy brings Count XV individually and on behalf of members of the New York Sub-Class against Defendants.

300.    By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices by making the Misrepresentations.

301.    The foregoing deceptive acts and practices were directed at consumers, including Plaintiff Jeffy and members of the New York Sub-Class.

302.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and qualities of Tommie Copper Products to induce consumers to purchase the Products.

303.    Plaintiff Jeffy and the New York Sub-Class Members were injured, and continued

to be injured, as a direct and proximate result of Defendants' unfair and deceptive acts and practices because they would not have purchased Tommie Copper Products, or would not have paid as much for Tommie Copper Products, if the true facts had been known to them.[103]

304.     Plaintiff Jeffy, on behalf of himself and other members of the New York Sub-Class, seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or $50.00, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## COUNT XVI
## (False Advertising, New York Gen. Bus. Law § 350)

305.      Plaintiff Jeffy and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

306.     Plaintiff Jeffy brings Count XVI individually and on behalf of members of the New York Sub-Class against Defendants.

307.     Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law.

308.     Defendants' false, misleading, and deceptive statements and representations of fact, including, but not limited to, the Misrepresentations, were and are directed to consumers, including Plaintiff Jeffy and members of the New York Sub-Class.

309.     Defendants' false, misleading, and deceptive statements and representations of fact, including, but not limited to, the Misrepresentations, were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

---

[103]     Though, Plaintiff Jeffy would still be interested in purchasing Tommie Copper Products in the future if the representations made by Defendants concerning the Products were true.

310.    Defendants' false, misleading, and deceptive statements and representations of fact, including, but not limited to, the Misrepresentations, have resulted in consumer injury or harm to the public interest.

311.    As a result of Defendants' false, misleading, and deceptive statements and representations of fact, including, but not limited to, the Misrepresentations, Plaintiffs and Class Members have suffered and continue to suffer economic injury.

312.    Plaintiff Jeffy and the New York Sub-Class suffered an ascertainable loss caused by Defendants' Misrepresentations because they paid for Tommie Copper Products, which they would not have purchased, or would not have paid as much for the Products, had they known the truth about the Products.

313.    Plaintiff Jeffy, on behalf of himself and other members of the New York Sub-Class, seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or $500.00, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## COUNT XVII
### (Breach of Express Warranty, N.Y. U.C.C. § 2-313)

314.    Plaintiff Jeffy and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

315.    Plaintiff Jeffy brings Count XVII individually and on behalf of members of the New York Sub-Class against Defendants.

316.    Defendants are, and were, at all relevant times merchants under N.Y. U.C.C. § 2-313.

317.    Defendants, as a manufacturer, marketer, distributor and/or seller, expressly warranted that Tommie Copper Products were fit for their intended purpose of making the Express

Warranties.

318.    In fact, Tommie Copper Products are not fit for such purposes because each of the Express Warranties is false and misleading.

319.    Plaintiff Jeffy and the New York Sub-Class Members were injured as a direct and proximate result of Defendants' breach of these warranties because they would not have purchased Tommie Copper Products, or would not have paid as much for the Products, if they knew the truth about the Products.

**COUNT XVIII**
**(Breach of Implied Warranty of Merchantability, N.Y. U.C.C. § 2-314)**

320.    Plaintiff Jeffy and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

321.    Plaintiff Jeffy brings Count XVIII individually and on behalf of members of the New York Sub-Class against Defendants.

322.    Defendants are and were at all relevant times, merchants under N.Y. U.C.C. § 2-313. Defendants, as the designer, manufacturer, marketer, distributor and/or seller, impliedly warranted that Tommie Copper Products were fit for their intended purpose in that that the Products would (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.  Defendants did so with the intent to induce Plaintiff and the New York Sub-Class Members to purchase Tommie Copper Products.

323.    Defendants breached the warranty implied in the contract for the sale of Tommie Copper Products in that the Products could not pass without objection in the trade under the contract description, the goods were not of fair or average quality within the description, the goods were unfit for their intended and ordinary purpose for which the Products are used, and the

Products do not conform to the affirmations of fact and/or promises made on the Products' packaging and labeling. As a result, Plaintiff Jeffy and members of the New York Sub-Class did not receive the goods as impliedly warranted by Defendants to be merchantable.

324.    In reliance upon Defendants' skill and judgment and the implied warranties of merchantability, Plaintiff Jeffy and members of the New York Sub-Class purchased Tommie Copper Products for use as a pain relief and/or injury management product to accelerate or speed recovery.

325.    The Products were not altered by Plaintiff Jeffy or members of New York Sub-Class.

326.    The Tommie Copper Products were unfit for their intended purpose, and Plaintiff Jeffy and members of New York Sub-Class did not receive the goods as warranted.

327.    Defendants knew that Tommie Copper Products would be purchased and used without additional testing for efficacy by Plaintiff Jeffy and members of New York Sub-Class.

328.    Plaintiff Jeffy and New York Sub-Class Members have been injured and harmed as a direct and proximate result of Defendants' breach of the implied warranty of merchantability because they would not have purchased Tommie Copper Products, or would not have paid as much for the Products, if they knew the truth about the Products.

**COUNT XIX**
**(Breach of Contract/Common Law Warranty)**

329.    Plaintiff Jeffy and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

330.    Plaintiff Jeffy brings this Count XIX individually and on behalf of the members of the New York Sub-Class against Defendants.

331.    To the extent Defendants' commitment is deemed not to be a warranty under New

York's Uniform Commercial Code, Plaintiff Jeffy and members of the New York Sub-Class plead in the alternative under common law warranty and contract law.

332.    Defendants breached this warranty or contract obligation by warranting that Tommie Copper Products were fit for their intended purpose in that they would (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.

333.    As a direct and proximate cause of Defendants' breach of contract or implied warranty, Plaintiff Jeffy, the Class, and New York Sub-Class Members have been injured and harmed because they would not have purchased Tommie Copper Products, or would not have paid as much for the Products, if they knew the truth about the product.

## OHIO

### COUNT XX
### (Breach of Warranty, O.R.C. § 1302.26)

334.    Plaintiff Kontura and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follow:

335.    Plaintiff Kontura brings Count XX individually and on behalf of members of the Ohio Sub-Class against Defendants.

336.    Defendants, as a manufacturer, marketer, distributor and/or seller, expressly and uniformly warranted that Tommie Copper Products were fit for their intended purpose of making the Express Warranties.

337.    In fact, Tommie Copper Products are not fit for such purposes because each of the Express Warranties is false and misleading.

338.    Defendants received sufficient and timely notice of the breaches of warranty.

Plaintiff Kontura and Ohio Sub-Class Members have given Defendants a reasonable opportunity to cure their failures with respect to their warranty, but Defendants have not done so.

339. Plaintiff Kontura and other members of the Ohio Sub-Class have been damaged, and continue to be damaged, as a direct and proximate result of Defendants' breach of their Express Warranties alleged in this Complaint because they would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, if they knew the truth about the Products. [104]

## COUNT XXI
### (Breach of Implied Warranty of Merchantability, O.R.C. § 1302.27)

340. Plaintiff Kontura and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

341. Plaintiff Kontura brings Count XXI individually and on behalf of members of the Ohio Sub-Class against Defendants.

342. Defendants, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that Tommie Copper Products were fit for their intended purpose in that copper-infused and "copper and zinc-infused" products would effectively (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance. Defendants did so with the intent to induce Plaintiff Kontura and members of the Ohio Sub-Class to purchase Tommie Copper Products.

343. Defendants breached the warranties implied in the contract for the sale of Tommie Copper Products in that the Products could not pass without objection in the trade under the

---

[104] Though, Plaintiff Kontura would still be interested in purchasing Tommie Copper Products in the future if the representations made by Defendants concerning the Products were true.

contract description, the goods were not of fair or average quality within the description, the goods were unfit for their intended and ordinary purpose for which the Products are used, and the Products do not conform to the affirmations of fact and/or promises made on the Products' packaging and labeling.  As a result, Plaintiff Kontura and members of the Ohio Sub-Class did not receive the goods as impliedly warranted by Defendants to be merchantable.

344.    In reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose, Plaintiff Kontura and members of the Ohio Sub-Class purchased Tommie Copper Products for use to (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.

345.    Plaintiff Kontura and other members of the Ohio Sub-Class have been damaged as a direct and proximate result of Defendants' breach of their implied warranty of merchantability alleged in this Complaint because they would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, if they knew the truth about the Products.

**COUNT XXII**
**(Ohio Consumer Sales Practices Act, O.R.C. §§ 1345, *et seq*.)**

346.    Plaintiff Kontura and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

347.    Plaintiff Kontura brings Count XXII individually and on behalf of members of the Ohio Sub-Class against Defendants.

348.    This cause of action is brought pursuant to the Ohio Consumer Sales Practices Act (the "CSPA"), ORC §§ 1345, *et seq*.  Plaintiff Kontura is a consumer under ORC § 1345.01(D) who purchased Tommie Copper Products for personal, family, and/or household use.  Therefore, the purchases of Tommie Copper Products by Plaintiff Kontura and members of the Ohio Sub-

Class are "consumer transactions" as that term is defined in O. R. C. § 1345.01 (A).

349.    As described herein, Defendants purposefully undertook a national media campaign to promote Tommie Copper Products thereby soliciting consumer transactions for those products on a nationwide basis.  As a result, Defendants are a "supplier" covered by the Ohio Consumer Sales Practices Act, which applies to all persons "engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer." O.R.C. § 1345.01(C).

350.    Plaintiff Kontura has standing to pursue this claim because she suffered injury in fact as a result of Defendants' actions set forth herein. Prior to filing this action, Plaintiff Kontura purchased Tommie Copper Products for personal use in reliance upon Defendants' false and misleading marketing claims.

351.    Defendants engaged in a uniform marketing and advertising campaign to solicit sales of Tommie Copper Products during the course of their business conduct.

**Unfair and Deceptive Acts or Practices**

352.    Defendants committed unfair and deceptive acts or practices in violation of the CSPA, ORC § 1345.02(A) and ORC § 1345.02(B)(1), by representing that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that it does not have.

353.    Defendants committed unfair and deceptive acts or practices in violation of the CSPA by representing that Tommie Copper Products can: (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.

354.    Such acts or practices have been previously determined by Ohio Courts to violate the CSPA. Defendants committed said violations after such decisions where available for public

inspection pursuant to ORC 1345.05(A)(3).

355.    Plaintiff Kontura and Ohio Sub-Class Members seek damages, rescission, declaratory judgment, or injunction against Defendants' unfair and deceptive acts or practices that violates the CSPA.

**Unconscionable Acts or Practices**

356.    In the alternative, Defendants committed unconscionable acts or practices in violation of the CSPA, ORC § 1345.03(A) as set forth in ORC § 1345.03(B)(1), by entering into a consumer transaction when the supplier knew, at the time the consumer transaction was entered into, of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction.

357.    Defendants committed unconscionable acts or practices in violation of the CSPA, ORC § 1345.03(A) as set forth in ORC § 1345.03(B)(1), by entering into a consumer transaction when Defendants knowingly made misleading statements of opinion on which the consumer was likely to rely on to the consumers' detriment.

358.    Such acts or practices have been previously determined by Ohio courts to violate the CSPA.  Defendants committed said violations after such decisions were available for public inspection pursuant to ORC 1345.05(A)(3).

359.    Plaintiff Kontura and other members of the Ohio Sub-Class have been damaged as a direct and proximate result of Defendants' unfair, deceptive, and unconscionable business practices alleged in this Complaint because they would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, if they knew the truth about the Products.

360.    Plaintiff Kontura and Ohio Sub-Class Members seek damages, rescission, declaratory judgment, or injunction against Defendants' unconscionable acts or practices that

violates the CSPA.

## FLORIDA

### COUNT XXIII
### (Breach of Express Warranty, Fla. Stat. § 672.313; U.C.C. § 2-313)

361.    Plaintiffs Bishop and Henderson and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

362.    Plaintiffs Bishop and Henderson bring Count XXIII individually and on behalf of members of the Florida Sub-Class against Defendants.

363.    Plaintiffs Bishop and Henderson, and each member of the Florida Sub-Class, formed a contract with Defendants at the time Plaintiffs and the other members of the Florida Sub-Class purchased Tommie Copper Products. The terms of that contract include the promises and affirmations of fact made by Defendants in advertising materials and through their marketing campaign, as described above.  Defendants advertising constitutes express and implied warranties, became part of the basis of the bargain, and is part of a standardized contract between Plaintiffs and the members of the Florida Sub-Class on the one end, and Defendants on the other

364.     At all times, and as detailed above, Defendants expressly warranted that Tommie Copper Products conform to Defendants' affirmations and promises and were fit for their intended purpose of making the Express Warranties.

365.    At the time of making these Express Warranties, Defendants knew or should have known that despite the above and other warranties alleged herein, it had breached the terms of the contract.

366.    Defendants breached the terms of the contract because Tommie Copper Products do not conform to Defendants' affirmations and promises, and are not fit for such purposes because each of the Express Warranties is false and misleading.

367.    Members of the public, including Plaintiffs and Florida Sub-Class Members, reasonably relied upon the skill and judgment of Defendants, and upon said Express Warranties in purchasing Tommie Copper Products.

368.    Plaintiffs Bishop and Henderson and the Class purchased Tommie Copper Products without knowledge that these Products were falsely represented.

369.    Plaintiffs Bishop and Henderson and other members of the Florida Sub-Class have been damaged as a direct and proximate result of Defendants' breach of their Express Warranties alleged in this Complaint because they would not have purchased the Tommie Copper Products, or would not have paid as much for the Products, if they knew the truth about the Products. [105]

370.    Plaintiffs are entitled to judgment and equitable relief against Defendants, as well as restitution, including all monies paid for Tommie Copper Products and disgorgement of profits from Defendants received from sales of Tommie Copper Products, attorneys' fees, punitive damages, and costs, as set forth in the Prayer for Relief.

371.    All conditions precedent to Defendants' liability under this contract, including notice, have been performed by Plaintiffs and the Class.

**COUNT XXIV**
**(Breach of Implied Warranty of Merchantability and Usage of Trade, Fla. Stat. § 672.314; U.C.C. § 2-314)**

372.    Plaintiffs Bishop and Henderson and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

373.    Plaintiffs Bishop and Henderson bring Count XXIV individually and on behalf of members of the Florida Sub-Class against Defendants.

---

[105]    Though, Plaintiffs Bishop and Henderson would still be interested in purchasing Tommie Copper Products in the future if the representations made by Defendants concerning the Products were true.

374.    The Uniform Commercial Code §2-314 provides that, unless excluded or modified, a warranty that the goods shell be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of the kind.

375.    At all times, Florida has codified and adopted the provisions of the Uniform Commercial Code governing the implied warranty of merchantability. Fla. Stat. § 672.314.

376.    Defendants' Tommie Copper Products are "goods" as defined in the Florida's commercial codes governing the implied warranty of merchantability.

377.    As designers, manufacturers, producers, marketers, labelers and sellers of Defendants' Tommie Copper Products, Defendants are "merchants" within the meaning of the various states' commercial codes governing the implied warranty of merchantability.

378.    By placing Defendants' Tommie Copper Products in the stream of commerce, Defendants impliedly warranted that Tommie Copper Products were fit for their intended purpose in that that the Products would (i) relieve pain, including arthritis and other chronic joint and muscular pain; (ii) aid in injury management and/or repair injured tissue; (iii) accelerate or speed recovery; and (iv) improve muscular power, strength, and endurance.  Defendants did so with the intent to induce Plaintiffs and Class Members to purchase Tommie Copper Products.

379.    Defendants breached the warranty implied in the contract for the sale of Tommie Copper Products in that the Products could not pass without objection in the trade under the contract description, the goods were not of fair or average quality within the description, the goods were unfit for their intended and ordinary purpose for which the Products are used, and the Products do not conform to the affirmations of fact and/or promises made on the Products' packaging and labeling.

380.    As merchants, Defendants knew that purchasers relied upon them to design, manufacture, label, and sell products that were not deceptively marketed, and in fact members of

the public, including Plaintiffs, reasonably relied upon the skill and judgment of Defendants and upon said implied warranties in purchasing Defendants' Tommie Copper Products.

381.    Plaintiffs and the Class members purchased Defendants' Tommie Copper Products for their intended purpose.

382.    Defendants' Tommie Copper Products defect was not open or obvious to consumers, including Plaintiffs and the Class, who could not have known about the true nature of the production of Defendants' Products.

383.    As a direct and proximate result of Defendants' breach of implied warranties, Plaintiffs Bishop and Henderson and members of the Florida Sub-Class did not receive the goods as impliedly warranted by Defendants to be merchantable.  Plaintiffs and Class members have sustained injuries by purchasing Defendants' Tommie Copper Products which was not as represented, thus entitling Plaintiffs to judgment and equitable relief against Defendants, as well as restitution, including all monies paid for Defendants' Tommie Copper Products and disgorgement of all profits from Defendants received from sales of Defendants' Tommie Copper Product, attorneys' fees, punitive damages, and costs, as set forth in the Prayer for Relief

**COUNT XXV**
**(Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.)**

384.    Plaintiffs Bishop and Henderson and Class Members re-allege and incorporate by reference each and every allegation set forth above, and further allege as follows:

385.    Plaintiffs Bishop and Henderson bring Count XXV individually and on behalf of members of the Florida Sub-Class against Defendants.

386.     This cause of action is brought pursuant to the Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 *et seq.*  The express purpose of the FDUTPA is to "protect the consuming public...from those who engage in unfair methods of

competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

387.    Plaintiffs and the Class are "consumers" within the meaning of the Fla. Stat. § 501.203(7).

388.    Defendants were engaged in "trade of commerce" as defined by Fla. Stat. § 501.203(8).

389.    Fla. Stat. § 501.204(1) declares unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

390.    Fla. Stat. § 501.204(2) states that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [section] 5(a)(1) of the Federal Trade Commission Act." Defendants' unfair and deceptive trade practices are likely to mislead – and have mislead – consumers acting reasonably in the circumstances, including Plaintiffs Bishop and Henderson and the Florida Sub-Class, and violate Fla. Stat. § 501.204 and 21 U.S.C. § 352.

391.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as describe herein which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

392.    Plaintiffs Bishop and Henderson and the Florida Sub-Class have been aggrieved by Defendants' unfair and deceptive practices in that they paid for Tommie Copper Products, products they would not have purchased, or would not have paid as much for, absent the Misrepresentations or on the same terms if the true facts concerning the Tommie Copper Products had been known.

393.    The damages suffered by Plaintiffs and the Florida Sub-Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendants, as more fully described herein.

394.    Pursuant to Fla. Stat. § 501.211(1), Plaintiffs and the Class seek actual damages, restitution and disgorgement.

395.    Additionally, pursuant to Fla. Stat. § 501.211(2) and 501.2105, Plaintiffs and the Florida Sub-Class make claims for damages and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members request that the Court enter an order or judgment against Defendants including the following:

A.    An order certifying that this action is properly brought and may be maintained as a class action;

B.    An order appointing Plaintiffs as class representatives of the Nationwide Class, as class representatives of their respective Sub-Classes, and their undersigned counsel as co-lead class counsel for the Class;

C.    An order requiring Defendants to bear the costs of Class notice;

D.    Restitution in such amount that Plaintiffs and Class Members paid to purchase Defendants' Tommie Copper Products;

E.    Actual damages, compensatory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

F.    Statutory damages allowable under New York Gen. Bus. Law §§ 349 and 350-e.

G.    Other appropriate injunctive relief;

H.      An order declaring Defendants' conduct as unlawful, and an order enjoining Defendants from unlawfully and misleadingly representing Tommie Copper Products in violation of state law;

I.      An order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre- and post-judgment interest on such monetary relief;

J.      An order requiring an accounting for, and imposition of, a constructive trust upon all monies Defendants received as a result of the misleading, fraudulent, and unlawful conduct alleged herein.

K.      Such other relief to which Plaintiffs and Class Members may be entitled to at law or in equity.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all causes of action or issues so triable.

DATED: March 4, 2016

**VOZZOLO LLC**
By: */s/Antonio Vozzolo*
   Antonio Vozzolo (AV-8773)
   345 Route 17 South
   Upper Saddle River, New Jersey 07458
   Telephone: (201) 630-8820
   Fax: (201) 604-8400
   Email: *avozzolo@vozzolo.com*

**THE LAW OFFICES OF**
**RONALD A. MARRON, APLC**
Ronald A. Marron (admitted *pro hac vice*)
*ron@consumersadvocates.com*
Skye Resendes (admitted *pro hac vice*)
*skye@consumersadvocates.com*
William B. Richards, Jr. (admitted *pro hac vice*)
*bill@consumersadvocates.com*
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**FARUQI & FARUQI, LLP**
Adam R. Gonnelli
685 Third Ave, 26th Fl.
New York, NY 10017
Telephone:  (212) 983-9330
Fax:  (212) 983-9331
Email: *agonnellie@faruqilaw.com*


*Appointed Interim Class Counsel and Attorneys*
*for Plaintiffs and the Putative Class*


**CUNEO, GILBERT & LADUCA**
Charles J. Laduca
507 C Street, NE
Washington, DC 20002
Email: *charlesl@cuneolaw.com*
Michael J. Flannery
7733 Forsyth Blvd., Suite 167
Clayton, Mo 63105
Email: *mflannery@cuneolaw.com*
Taylor Asen
16 Court Street, Suite 1012
Brooklyn, NY 11241
Email: *tasen@cuneolaw.com*
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

**LOCKRIDGE GRINDAL NAUEN**
**PLLP**
Robert K Shelquist (*pro hac vice*)
Email: *rkshelquist@locklaw.com*
Rebecca A. Peterson (*pro hac vice*)
Email: *peterra@locklaw.com*
100 Washington Ave South
Suite 2200
Minneapolis, MN 55401-2159
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

**HUDSON, MALLANEY, SHINDLER &
ANDERSON, P.C.**
Brian O. Marty
Email: *bmarty@hudsonlaw.net*
J. Barton Goplerud
Email: *jbgoplerud@hudsonlaw.net*
5015 Grand Ridge Drive, Suite 100
West Des Moines, IW 50265
Telephone: (515) 223-4567
Facsimile: (515) 223-8887

*Additional Counsel for Plaintiffs*